UNITED STATES of America,
Plaintiff-Appellee,

v.

Heather McFADYEN–SNIDER,
Defendant-Appellant.

No. 76–2022.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 14, 1977.

Decided April 15, 1977.

Martin S. Gerber, Chicago, Ill., Hal Gerber, Gerber, Bernstein, Gerber & Winestone, Memphis, Tenn., for defendant-appellant.

Charles H. Anderson, U. S. Atty., Richard L. Windsor, Martha J. Trammell, Nashville, Tenn., for plaintiff-appellee.

Before WEICK and LIVELY, Circuit Judges, and TAYLOR *, District Judge.

WEICK, Circuit Judge.

Appellant, Heather McFadyen-Snider (hereinafter referred to as Heather), appeals from a judgment of conviction entered upon a guilty verdict by a jury on two counts of an indictment charging her with the making of interstate telephone calls for the purpose of carrying out a scheme to defraud the Hamilton Bank of Nashville, in violation of 18 U.S.C. § 1343; on one count charging mail fraud in violation of 18 U.S.C. § 1341; and on one count charging the making of a false financial statement to the Hamilton Bank of Nashville for the purpose of influencing said bank in extending credit, in violation of 18 U.S.C. § 1014. The jury was unable to agree upon a verdict as to a false verbal statement count and the Government dismissed the charge, namely, on Count 2. She received three five-year concurrent sentences on the wire and mail fraud counts, and a suspended sentence with three years' probation on the false financial statement, Count 5.

Heather's main contentions on appeal are that prejudicial error was committed and she was denied a fair trial by the erroneous admission of evidence to the effect that she had been a prostitute; that such evidence was not relevant in any respect to the mail fraud charges for which she had been indicted, and such evidence was introduced by the prosecutor for the sole purpose of creating prejudice against her; that evidence concerning her writing bad checks was unrelated to the offenses charged in the indictment; and that the trial judge assumed the role of the prosecutor in extensively cross-examining witnesses and commenting on the credibility of the defendant.

We reverse defendant's conviction because of misconduct of the prosecutor, and remand the case for a new trial.

I

The facts in this case reveal an incredible lack of ordinary care, diligence, and prudence on the part of the bank officials of

* The Honorable Robert L. Taylor, Judge, United States District Court for the Eastern District of Tennessee, sitting by designation.

the Hamilton Bank of Nashville, together with their cupidity, all of which contributed in a large measure to whatever loss it sustained.

In March, 1974 Heather called by telephone from Miami, Florida, a bank in McMinnville, Tennessee, to seek financing for the purchase of railroad crossties for the Union Pacific Railroad. That bank referred her to the Hamilton Bank of Nashville and Max Herrin, the bank's executive vice-president. Shortly thereafter Heather contacted Herrin and informed him of the need for financing on the railroad crossties and on two or four million metric tons of rice commodities in South America which she stated she owned or controlled. The difference between "two or four million metric tons" and "owned or controlled" should certainly have caused a banker with ordinary intelligence to make some investigation to ascertain whether she owned or controlled the rice, and the amount of it. The bank was eager for her business because she promised the bank a commission of one dollar on each ton of rice she was able to sell.

On May 4, 1974 Heather came to Nashville to open three bank accounts in the Hamilton Bank. She submitted also a notarized financial statement in which she purported to own more than $800,000 in assets. Among those assets, the bulk of her wealth was tied up in four pieces of Florida real estate, in which she claimed ownership of a 25% interest, and a house in Pass Christian, Mississippi. In fact, she did not own any of this property, but the bank did not learn of these facts until late 1974. Heather's account was referred to the International Department of the Hamilton National Bank in Chattanooga, a subsidiary of the Hamilton Bank of Nashville.

On May 7, 1974 Heather wrote two checks for $6,300 to the Hamilton Bank on her Florida bank checking account. On May 24th the checks were returned unpaid for insufficient funds. Nevertheless, the Hamilton Bank officials arranged to have its John Andresen, from its International Department, accompany Heather to England to check out Heather's buyers on her commodity contracts and the banks that would be issuing letters of credit. Heather agreed to pay Andresen's expenses.

Andresen went to England on May 23, 1974 for two days, and returned for a business meeting. He returned to England on May 30th and remained there until June 13th. Upon his return to the United States his airline ticket, paid for by Heather, was not honored by BOAC because Heather's check to the airline had been returned for lack of sufficient funds.

While in England Andresen never confirmed Heather's ownership of commodities, nor saw any warehouse receipts; however, he did sign as a witness on a "contract" for the sale of 500,000 metric tons of wheat, between Heather as seller and a Mr. Siheeb as buyer. In the space in the contract where the buyer's name was to appear, neither Mr. Siheeb's name nor any other person's name appeared. The deal was never consummated. Moreover, Andresen, Heather, Herrin, and James Denton, Hamilton Bank President, participated in a conference trans-Atlantic telephone call. The call concluded with the bank agreeing to extend Heather $25,000 credit, a portion of which was to be used to clear the unpaid checks and to pay for the London trips [1], two of which were made by Andresen, the bank employee. In return, Heather executed a $25,000 promissory note. She received only about $20,000 of the authorized credit. According to Alan Haefele, Vice President and Cashier, she paid $5,300 on the note. The note was not even offered in evidence. The trips to London failed to result in obtaining a single enforcible contract.

It does seem strange that with all the testimony about interstate telephone calls

1. The record is unclear whether Heather actually participated in the call, and if she did, whether she heard the entire telephone call. Only Andresen testified that Heather was a part of the call; Herrin and Denton never mentioned Heather as being at the other end of the line.

to carry out a scheme to defraud, mail fraud, and false financial statements relating in some instances to railroad crossties, alleged deals for rice and other commodities, concerning which the bank was to receive one dollar a ton as commission on the commodity sales, there was no proof that the bank ever advanced one cent to the defendant on any of these transactions, or that the defendant made any sales whereby the bank would be entitled to a commission.

Because Heather did not pay her indebtedness to the bank, she was charged with fraud, convicted and sentenced to three years' imprisonment, plus probation, on Count 5.

When Heather returned to the United States she went first to New York and Chicago; later she went back to Tennessee to see where she stood with the Hamilton Bank.

On July 5 and 8, 1974 Heather met with John Mousourakis of the International Department in Chattanooga. Again Heather could not verify that she owned any commodities. When asked she presented to Mousourakis the same financial statement which she had previously given to the bank in May, 1974. Mousourakis was not persuaded that Heather was still a good financial risk, and thus Heather's business dealings with the Hamilton Bank were terminated. Heather never produced proof that she owned or controlled the rice commodities, or any other commodities. The railroad crossties deal "fell through".

In November, 1974 the bank employed the services of Timothy Hooper, a private investigator from Hendersonville, Tennessee, to investigate Heather. Apparently Hooper's investigation led to the federal grand jury indictments herein.

## II

During the trial the following colloquy occurred at the bench, out of the hearing of the jury:

MR. WINDSOR [Assistant United States Attorney]: I want to make an offer of proof because I think that the nature of it is somewhat sensitive. I don't want to jeopardise [sic] the proceedings so far.

The proof would be testimony from three separate witnesses who acquired the information at three separate times and places from the mouth of this defendant that she was a professional prostitute in Miami and she worked the Democratic Convention and in that year she made $25,000 quote lying on her back end quote and described a house where she lived with other girls and carried on the business of prostitution with a select clientele of rich men and that when Mr. Joe Landrum stated to her upon receiving this knowledge, Heather, I don't think you are capable of that, she replied, of course I am. How do you think I got all those rich men?

I think it is relevant and proper on the question of her credibility in this case.

THE COURT: Well, in the first place she doesn't have any credibility, and you have a lot more credibility matters than that.

MR. LEVINE [Defense Counsel]: I believe there are.

THE COURT: I am not talking about in the past. I am talking about overkill. I think this other is just overkill.

MR. LEVINE: Right.

THE COURT: That is just what you have got. Stay away from that if you can avoid it. I think it is overkill.

She starts telling you what a good woman she is, that is a different deal. She isn't saying that.

Nevertheless, on rebuttal the Government, through the testimony of Nancy Ladner, Heather's secretary during September, 1973, introduced the following evidence:

Q [By the Assistant United States Attorney]: Did she [Heather] ever tell you about a time in Florida where rich men were in competition with each other dating her?

A [Ms. Ladner]: Yes, sir.

Q What did she tell you?

A That there had been several men that had been competing for her favors over a period of a year.

Q Did she tell you how they competed?

A Well, that she had been kept by several men over a period of a year.

Q Did she say how much money she made that year?

A $25,000.

The Government did not stop there. It immediately questioned Joe Landrum, a party who had shared office space with Heather during part of 1973, concerning Heather's relationship with rich men. Mr. Landrum testified:

Q [By the Assistant United States Attorney]: Mr. Landrum, did Mrs. Heather McFadyen-Snider ever tell you about any relationship she had with rich men in Florida?

A Yes, sir.

Q Where and when did she tell you this?

A In Gulfport, Mississippi, in 1973.

Q What did she tell you?

A She told me she had sold herself to prominent, wealthy men.

Heather contends that the jury could only conclude from this testimony that she was a prostitute. She argues that such testimony was irrelevant and prejudicial, and therefore it deprived her of a fair trial. It was properly characterized by the District Judge as prosecutorial overkill. Despite the warnings given by the District Judge to the prosecutor at the bench hearing, the prosecutor persisted in ignoring these warnings and deliberately offered the incompetent evidence in rebuttal. This evidence rebutted nothing; plaintiff did not testify that she had been a good moral person.

■ The effect of the foregoing testimony was to impeach the defendant's character by her sexual conduct. In *United States v. Cox*, 536 F.2d 65, 71 (5th Cir. 1976) the Court said:

Evidence of illicit sexual activities is totally immaterial to the credibility or character traits involved in most criminal cases . . . . .

This is especially true where the conduct does not involve a substantive issue of the case, *United States v. Cox, id.,* and would serve only to unduly harass the defendant. *United States v. Marchesani,* 457 F.2d 1291, 1297 (6th Cir. 1972).

As noted by the Court in *Aaron v. United States,* 397 F.2d 584, 585 (5th Cir. 1968):

Appellant was on trial for a crime which involved the question of his honesty and fair dealing. The direct examination of his character witness was properly limited to these areas. Rumors of an illicit affair with a woman, even if these rumors were true, were wholly immaterial to the character traits involved in this case. The question was therefore improper, and the defense objection was properly sustained.

■ The proper standard which the trial judge should apply in receiving this evidence is whether, in his sound discretion, the probative value of the proffered testimony outweighs the possibility of undue prejudice to the defendant. Only upon a grave abuse of discretion will his ruling be overturned. *United States v. Jenkins,* 525 F.2d 819, 824 (6th Cir. 1975).

■ Applying this test to the present case, the trial judge abused his discretion in permitting rebuttal testimony concerning Heather's "prostitution" activities to be introduced into evidence. Allowing Landrum to testify that Heather "sold herself to prominent, wealthy men" not only resulted in prosecutorial overkill, but also permitted the jury to consider evidence of Heather's background which was wholly unrelated to the charges against her of wire and mail fraud and false statements. This evidence added nothing to the prosecutor's case and served only to cater to the passions of the jury. It tended to put her on trial for conduct not in the indictment, and prejudiced her chance for a fair trial.

### III

In the Government's case-in-chief Nancy Ladner testified that Heather had given her a pay and severance check in September, 1973; and that the check was unpaid for

lack of sufficient funds in the bank. When Ladner confronted Heather about the bad check Heather merely tore up the check and wrote Ladner a new check on a different account in another bank. This second check also was unpaid because the account had been closed.

Similarly, Joe Landrum received a check from Heather for $125,000, representing payment to Landrum for work performed for Heather. He received the check either in late 1972 or early 1973. When he presented the check to the bank Landrum discovered that Heather did not have an account.[2]

Moreover, during cross-examination of the defendant, the Government asked Heather about a $15,400 check allegedly written by Heather to Edmund Smith in January, 1973 on what the evidence indicated was a nonexistent bank account. Although the check was never introduced into evidence, Heather said she did not remember writing the check. She did admit, however, that the signature on the check appeared to be her signature.

At the close of the trial the trial judge instructed the jurors generally as to intent and then noted that the evidence that Heather gave bad checks to Ladner was probative of Heather's intent to defraud, or a pattern or scheme of action to defraud the Hamilton Bank, but not of her guilt as to the charges in the indictment.

■ Heather claims that the testimony concerning these bad checks denied her a fair trial. She argues that this evidence was unrelated to the charges in the indictment. The Government, on the other hand, responds that its questions to Ladner and Landrum were relevant to show their bias or ill feelings toward the defendant, and that the cross-examination of Heather on the Smith check was proper. This Court, however, agrees with the appellant that she was deprived of a fair trial. Ladner and Landrum were Government witnesses. It is not understandable why the Government would want to prove that its own witnesses were biased. The real reason the prosecutor offered the testimony was to get before the jury incompetent and inadmissible evidence which was highly prejudicial and which deprived the defendant of a fair trial.

■ The evidence as to the bad checks concerned prior misconduct by the defendant. Such evidence is inadmissible to prove the defendant's character or criminal propensity, but rather, is admissible under Fed. R.Evid. 404(b) to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *United States v. Ailstock,* 546 F.2d 1285, 1289 (6th Cir. 1976); *United States v. Largent,* 545 F.2d 1039, 1043 (6th Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 1117, 51 L.Ed.2d 546 (1977); *United States v. Faulkner,* 538 F.2d 724, 728 (6th Cir.), *cert. denied,* —— U.S. ——, 97 S.Ct. 640, 50 L.Ed.2d 624 (1976); *United States v. Semak,* 536 F.2d 1142, 1144 (6th Cir. 1976); and *United States v. Ring,* 513 F.2d 1001, 1004 (6th Cir. 1975). "Generally, this evidence must be substantially similar and near in time to the offense charged, must be in issue, and must have more probative value than prejudicial impact." *United States v. Largent, supra,* at 1043. *See also United States v. Ring, supra,* at 1005.

■ However, Rule 404(b) is not to be interpreted mechanically, and under its flexible guidelines even dissimilar crimes can be admitted in certain special situations. *See* Advisory Committee Note to Rule 404(b); *United States v. Moss,* 544 F.2d 954 (8th Cir. 1976); *United States v. Johnson,* 542 F.2d 230 (5th Cir. 1976); and *United States v. Barrett,* 539 F.2d 244 (1st Cir. 1976).

■ The appropriate focus of appellate review is to determine whether the trial judge abused his discretion in deciding that the probative value of the proffered evidence outweighs the danger of undue prejudicial effect. *United States v. Riggins,* 539 F.2d 682, 683–84 (9th Cir. 1976); *United*

2. Landrum also testified that he was in possession of a $500 check from Heather. It is unclear from the record whether this check cleared for payment.

States v. Cook, 538 F.2d 1000, 1003 (3d Cir. 1976); and Fed.R.Evid. 404(b), Advisory Committee Note.

■ Thus if the proffered evidence concerns misconduct other than that charged in the indictment, it is inadmissible when the resulting prejudice would be too great. *United States v. Wiley,* 534 F.2d 659, 663 (6th Cir. 1976), and would "not tend to establish the commission by the accused of the offense charged." *United States v. McCarthy,* 470 F.2d 222, 224 (6th Cir. 1972). *See also United States v. Blanton,* 520 F.2d 907, 909–10 (6th Cir. 1975), and *United States v. Gebhart,* 441 F.2d 1261, 1264 (6th Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 97, 30 L.Ed.2d 96 (1971).

■ In the present case the evidence that Heather gave Landrum, Ladner and Smith bad checks was wholly unrelated to the charges of wire and mail fraud and false statements. Admittedly the evidence that Heather gave the Hamilton Bank and BOAC bad checks was admissible even though the checks were later paid by the $25,000 loan made to her by the bank, which also took care of the expenses of the trips to London.

Appellant Heather does not challenge this evidence. However, the contested evidence of bad checks to others tended to put the defendant on trial for her prior misconduct, for which she was not charged. This evidence did not merely imply that Heather was a party to other mischief, but rather it directly imputed to her other bad acts that were not necessary to prove the prosecution's case, and thus the evidence was prejudicial to her right to a fair trial.

Furthermore, the trial court's jury instruction did not cure the prejudice from the inadmissible evidence. The jury instruction was too limited because only the bad checks to Ladner were ever mentioned. The jury's exposure to this evidence during the trial was never limited by cautionary instructions that the evidence was received only as to the defendant's intent. *See United States v. Ailstock,* 546 F.2d 1285, 1291 (6th Cir. 1976).

IV

The testimony concerning Heather's prostitution, and the repeated introduction of evidence of Heather's writing of bad checks, independently are reversible errors. Although the evidence as to the bad checks is a closer question, this Court is of the opinion that these errors were not harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Lastly, Heather claims that the trial judge's active participation in the trial and his questioning of witnesses during the trial gave the jury the impression that he did not believe the defendant's testimony, and that he was biased and partial to the prosecution. Because of our resolution of the question of admissibility of the testimony concerning Heather's prostitution activities and the bad checks we need not reach this issue, as it is unlikely that the District Judge would want to try this case again.

We therefore reverse the judgment of conviction of the defendant and accordingly remand this case to the District Court for a new trial.