803 F.2d 722
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee
v.
LINDA LEE BROCK, and JAY THOMAS KNOWLES, Defendants-Appellants.
 No. 85-5345.
 No. 85-5390.
 United States Court of Appeals, Sixth Circuit.
 Sept. 22, 1986.
 
 Before: LIVELY, Chief Judge, and JONES and NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 JONES, Circuit Judge,
 
 
 2
 In December of 1984 Linda Brock and Jay Knowles were indicted by a federal grand jury for having possessed an explosive device that had been planted 32 months earlier in a pickup truck owned by Mr. Knowles' former wife, Helen Knowles. In due course Mr. Knowles and Mrs. Brock were tried and convicted. Both defendants contend, on appeal, that their Fifth Amendment due process rights were violated by the government's delay in indicting them. Mr. Knowles contends further that the trial court erred in admitting evidence of prior acts of violence against Helen Knowles and her property. Mrs. Brock contends that the trial court erred in admitting evidence suggesting that she was guilty of attempted murder. We find none of these contentions well taken, and we shall affirm both convictions.
 
 
 3
 * Jay and Helen Knowles were married in 1963. Their marriage was less than idyllic, and they periodically engaged in physical altercations. In 1978 Jay Knowles beat Helen so severely that she had to spend three days in the hospital; she divorced him when she got out, but they continued to live together until the end of 1979. On Mother's Day of 1980 he beat her severely enough to require stitches inside and outside her mouth. On two occasions he discharged a firearm into her motor vehicle while she was not in it.
 
 
 4
 There was a long-standing feud between Helen Knowles and Linda Brock, and the two women fought repeatedly. On Halloween night in 1981 Linda Brock fired a shotgun or rifle at a truck in which a group of people that included Helen Knowles were having a hayride. Helen was not hit, but others were. Jay Knowles was incarcerated in the local county jail at this time, and although he was privileged to leave the jail with some frequency, he was not involved in the 1981 shooting incident.
 
 
 5
 On April 20, 1982 - more than two weeks before Jay Knowles was finally discharged from the county jail - an explosive device was placed under the hood of Helen Knowles' pickup truck. The truck had been parked that morning outside the factory where Helen worked, and shortly before lunch that day three people - two men and a woman -- were seen leaning under the hood. One of the witnesses recognized Jay Knowles as a member of this group, and expressed surprise at seeing him because he had thought Mr. Knowles was in jail. The witnesses were subsequently able to identify the woman as Linda Brock.
 
 
 6
 Helen Knowles drove off in the truck at lunch time. The device did not explode, but the truck - which had been running well until that time - kept misfiring, and its erratic operation led to discovery of the explosive device later that day. The device consisted of a stick of dynamite, blasting cap, and wiring. It was eventually established that the dynamite had been obtained by Linda Brock through a friend after Linda had made repeated inquiries about the availability of dynamite and, on one occasion, had sought advice on wiring dynamite to a car so it would blow up.
 
 
 7
 Agent Hurst, of the United States Treasury Department's Bureau of Alcohol, Tobacco and Firearms, conducted an extensive investigation. He obtained no solid leads for approximately five months, but in the latter part of September, 1982, he located two eyewitnesses to the ministrations to Helen's truck in the factory parking lot on the morning of April 20. Agent Hurst promptly interviewed Jay Knowles, who professed innocence and maintained that he had been in jail that day. The Sheriff and his Chief Deputy were also interviewed at this time, but neither of them could say for sure whether Mr. Knowles had been in the jail all day on April 20th or not; the sheriff's department maintained no written record of the comings and goings of prisoners who, like Mr. Knowles, were not always kept locked up.
 
 
 8
 In 1983 Jay Knowles was tried and convicted under a federal statute that prohibits convicted felons from possessing firearms. (The conviction was affirmed in United States v. Knowles, 744 F.2d 539 (6th Cir. 1984).) In 1984 Mrs. Brock was tried and convicted under a federal statute that prohibits convicted felons from possessing explosives transported in interstate commerce. (That conviction was affirmed by this court in United States v. Brock, No. 84-5809 (unpublished), filed April 23, 1985.) In connection with both of these criminal proceedings the government attempted to persuade Mr. Knowles and Mrs. Brock to identify the third man who had been seen with his head under the hood of Helen Knowles' pickup truck; those efforts were unsuccessful. Independent efforts to locate the third man also proved unsuccessful. Mr. Knowles and Mrs. Brock were finally indicted - alone - in December of 1984 on charges that on or about April 20, 1982, they unlawfully possessed and conspired to possess a firearm not registered to them, an act prohibited by 26 U.S.C. Sec. 5861(d). The indictment described the "firearm" as "a destructive device which was an explosive . . . namely, a stick of Trojan dynamite, wrapped in newspaper and taped together with masking tape, along with an electric blasting cap with orange and yellow leg wires inserted in the end of the dynamite."
 
 
 9
 At the time of trial the government made known its desire to present evidence of a series of prior acts by Jay Knowles and Linda Brock manifesting hostility toward Helen Knowles. The trial court heard testimony on these matters outside the presence of the jury, and then decided to let the jury hear evidence of the 1978 and 1980 beatings by Jay Knowles, the two shootings by him at Helen's car, and the 1981 Halloween hayride shooting by Linda Brock. Evidence of more mundane misconduct was held inadmissible.
 
 
 10
 After the evidence in question was presented to the jury, the court gave the jury a carefully worded instruction to the effect that it was to be considered solely as it might relate to the issues of motive and identity and for no other purpose. "It is specifically not admitted," the court told the jury, "and you absolutely will not consider these alleged earlier acts and alleged wrongs for the purpose of proving the character of the persons involved in order to show or to draw any conclusion or inference that such persons may have acted in conformity with their prior alleged behavior at a later time. It is not for that purpose." By a show of hands, the members of the jury affirmatively acknowledged that they understood these instructions and had no reservations about them.
 
 
 11
 One of the government's witnesses was an "explosive enforcement officer" from Washington. He opined, as an expert, that the device planted in Mrs. Knowles' pickup was "an improvised explosive weapon commonly known as an explosive bomb," rigged to explode when the vehicle's ignition was turned on and so placed that the explosion "would have turned the metal in the fire wall into very tiny fragments much like hand grenade fragments, projecting them into the driver compartment, and would have resulted in extensive damage to the truck and project[ed] fragments would have caused the minimum of serious injury if not death to the driver of the vehicle." After the prosecutor's question as to the results of an explosion had been asked and answered, counsel for Mrs. Brock objected and moved that the jury be instructed to disregard the testimony as the effect of an explosion of the dynamite. The court thereupon told the jury that the testimony was to be considered solely as a part of the description of the device, the infliction of harm not being an element of the offenses charged in the indictment and there being no allegation that harm was intended.
 
 
 12
 Mrs. Brock called an alibi witness named Ward, who testified that Mrs. Brock had spent the day of April 20, 1982, at his house. Mr. Knowles presented evidence that he had visited his sick brother in a Chattanooga hospital on April 12, 1982, and that at some point after his return to the county jail from that visit he had been kept in "lock-down" status at the jail for some period of time.
 
 
 13
 After the jury returned verdicts of guilty, Mr. Knowles moved for a new trial on the basis of the allegedly erroneous admission of evidence of his prior assaults on Helen Knowles and on the basis of allegedly prejudical pre-indictment delay. In the latter connection Mr. Knowles submitted affidavits from the sheriff's wife, who had supervised the daily operation of the county jail, and a deputy sheriff, both of whom said they could not remember for sure when Mr. Knowles had been in "lock-down" status, but believed they could have provided more details if interrogated within a year after the time inquired about.
 
 
 14
 The trial court granted a request by Mr. Knowles for an evidentiary hearing on the motion for new trial, and Agent Hurst testified at the hearing that substantially all of the evidence against Mr. Knowles had been developed by the end of the first week in October, 1982. The subsequent delay in seeking indictments was not intended to make it harder for Mr. Knowles to establish his alibi, Agent Hurst testified; the U.S. Attorney's office was expressing reluctance about seeking an indictment until the identity of the third person involved in the April 20 incident had been ascertained. Agent Hurst said that he had repeatedly discussed with the U.S. Attorney's office the possibility that Mr. Knowles and Mrs. Brock could be induced to name the third man. Agent Hurst also gave hearsay testimony casting doubt on the completeness of the affidavits of the Sheriff's wife and the deputy sheriff. Mr. Knowles did not call the affiants to testify in person.
 
 
 15
 At the conclusion of the evidentiary hearing the trial court found there had been no misconduct by the government in respect of the timing of the indictment, no intentional delay for the purpose of impeding the defense, and no reckless disregard of circumstances suggesting a risk that delay would impair Knowles' ability to mount an effective alibi defense. The court had before it an affidavit from the assistant U.S. Attorney in charge of the case explaining his reluctance to seek an indictment before the third man was identified and noting that the attorneys for Mr. Knowles and Mrs. Brock had been apprised that their clients were the prime suspects in the attempted bombing case and that the government was seeking to identify the third conspirator - a quest in which the cooperation of Mr. Knowles and Mrs. Brock had been sought through the attorneys. The court found that Mr. Knowles had failed to sustain his burden of demonstrating that the timing of the indictment had prejudiced him, and the motion for a new trial was denied.
 
 II
 
 16
 We agree with the trial court's conclusion that the pre-indictment delay was unexceptionable; the conclusion is amply supported by the court's findings, and the findings are amply supported by the record.
 
 
 17
 In determining whether there has been an "oppressive delay" entitling a defendant to invoke the "limited" protection provided by the Due Process Clause in pre-indictment delay situations, a court must consider both the reasons for the delay and the extent of any prejudice flowing from it. United States v. Greene, 737 F.2d 572, 574 (6th Cir. 1984). Here there was every reason to believe, as the trial court did believe, that the reason for the delay was perfectly legitimate -- to find the third person seen tampering with the pickup truck on April 20, 1982, so all three could be indicted and tried together. There was no showing that the delay was designed to gain any unfair tactical advantage.
 
 
 18
 Mr. Knowles contends that this case presents the question left unresolved by United States v. Lovasco, 431 U.S. 783 (1977) - "whether a delay occasioned by the government's reckless disregard of a likely harm to defendants' ability to present a defense would violate the Due Process Clause" - but we read this record as the Supreme Court read the record in Lovasco: "there is no evidence of recklessness here." Id. at 795, n.17.
 
 
 19
 Neither was there any evidence of undue prejudice. Mr. Knowles and Mrs. Brock did not become prime suspects until almost five months after the bombing attempt, and if personnel at the jail were prepared to testify that they could have remembered, if asked five months after the event, whether Mr. Knowles had or had not been in the jail shortly before noon on April 20, 1982, they should have been called to testify at the post trial evidentiary hearing. The decision not to call them was a deliberate one, and the jailers' vague affidavits are insufficient to cure the failure of proof on this point.
 
 
 20
 Moreover, Mr. Knowles knew he was a suspect almost as soon as he became one; if proof was available in October of 1982 that Mr. Knowles had been locked up on April 20, there was nothing to prevent him from taking statements from the pertinent witnesses or otherwise attempting to nail the proof down. The testimony of the eyewitness who knew Mr. Knowles by sight and who saw him under the hood of Helen Knowles' truck on April 20 suggests rather strongly that Mr. Knowles was not prejudiced by the dimming of his jailers' memories; that testimony indicates that the reason Mr. Knowles could not present convincing evidence that he had been locked up all day on April 20 was that he had not been.
 
 
 21
 Neither was Mrs. Brock prejudiced by the delay. Her problem was not that she could not come up with alibi testimony - she could and did - but that the testimony was not credited by the jury. Her claim of prejudice in this case is no more persuasive than the similar claim which she made and we rejected in Case No. 84-5809.
 
 III
 
 22
 Both defendants contend that the trial court erred in admitting evidence of other bad acts.
 
 
 23
 In Mrs. Brock's case the contention is phrased thus: "The court erred by allowing the government to establish proof of a possessory crime through admission of evidence which suggested that the appellant had also engaged in the graver crime of attempted murder." As we read her brief, the attempted murder evidence complained of is not the evidence that Linda Brock shot at a truck in which Helen Knowles was riding on Halloween in 1981, but the evidence that the dynamite bomb was placed in a location where, if it had exploded when the driver turned on the ignition of the pickup truck, it would have killed or seriously injured the driver. Perhaps Mrs. Brock intended to address both categories of evidence; if so, neither complaint is well taken.
 
 
 24
 Whoever was at fault for the feud between Mrs. Brock and Mrs. Knowles (and in colloquies with the trial court outside the hearing of the jury Mrs. Brock's counsel argued that it was unfair to admit evidence of the Halloween shooting because the feud was caused by Mrs. Knowles), the existence of the feud was directly relevant to the issue of motive, and the testimony on the shooting was highly probative of the existence of the feud. There was no error in admitting the shooting testimony.
 
 
 25
 As to the testimony about the damage that would have been caused if the dynamite had exploded, we note that there was no objection until the question had been asked and answered; that the court promptly told the jury to consider the testimony only as part of the description of the explosive device; and that counsel neither took exception to the curative instruction nor moved for a mistrial.
 
 
 26
 A mistrial would not have been justified in any event. In order to prove that the dynamite device was an unregistered "firearm," the government had to prove that it was a "destructive device." 26 U.S.C. Sec. 584-5(a). The testimony in question showed that it was. If the testimony was somewhat more graphic than necessary, we see no undue prejudice; the jury is likely to have assumed the dynamite was dangerous, and the testimony merely confirmed that assumption. This case is not governed by United States v. Green, 548 F.2d 1261 (6th Cir. 1977), United States v. Calhoun, 544 F.2d 291 (6th Cir. 1976), or United States v. Miller, 594 F.2d 1085 (6th Cir.), cert. denied, 444 U.S. 829 (1979), on which Mrs. Brock relies.
 
 
 27
 Mr. Knowles contends that he was denied a fair trial on the possession and conspiracy charges because of the introduction of proof of "unrelated" acts of violence toward Helen Knowles, but such evidence was not "unrelated" to the charges on which Mr. Knowles was being tried. If Mr. Knowles harbored bitter feelings toward Helen Knowles, as his past violent behavior toward her suggested he did, evidence of his hostility toward her would tend to establish that he had a motive for possessing the bomb that ultimately came into the unwanted possession of Helen Knowles. Proof of the prior acts of violence directed against Helen Knowles was admissible for this purpose.
 
 
 28
 A case in point is Wakaksan v. United States, 367 F.2d 639 (8th Cir. 1966), cert. denied, 386 U.S. 994 (1967), where the defendant was charged with voluntary manslaughter under 18 U.S.C. Sec. 1112 for allegedly killing his wife on an Indian reservation. Evidence of a previous conviction for an assault and battery on his wife "was relevant to show appellant's state of mind and probable intent. The prior relationship between the parties, as evidenced by the assault and battery, was also relevant to show motive, the identity of the aggressor, and the absence of any mistake or accident." 367 F.2d at 645 (citations omitted). See also United States v. Engleman, 648 F.2d 473, 483 (8th Cir. 1981), where evidence of a prior bomb attack by the defendant against a person subsequently killed by bombing was held admissible in a trial on charges related to the second bombing; the evidence, said the court, tended to "demonstrate a motive for the bombing."
 
 
 29
 In United States v. Ring, 513 F.2d 1001 (6th Cir. 1975), on which Mr. Knowles relies, reversal of a conviction of mailing threatening letters was warranted because of admission of evidence that the defendant had threatened a person other than the recipient of the letters. Mr. Knowles' reliance on Ring is obviously misplaced; in the case at bar the recipient of the bomb was the same person Mr. Knowles had attacked earlier.
 
 
 30
 Mr. Knowles also relies on United States v. Phillips, 599 F.2d 134 (6th Cir. 1979), where a bank robbery defendant successfully challenged the admission of evidence that he had participated in other bank robberies. It was not shown that the previous robberies were part of a comprehensive design or plan, nor was it shown that there was a distinctive "signature" appearing in all of the crimes. No other justification for admitting the evidence was asserted, so the case is inapposite here.
 
 
 31
 United States v. McFadyen-Snider, 552 F.2d 1178 (6th Cir. 1977), was a fraud case in which the trial court admitted evidence that the defendant had written bad checks which had no relation to the alleged fraud in issue. This court held that the unrelated prior incidents lacked sufficient probative value to warrant admission; in the present case, as we have seen, the prior acts are related to the act under consideration because the victim is the same, and the probative value of the prior acts is therefore higher here.
 
 
 32
 It is true that the evidence complained of here antedated the bomb attempt by a considerable period, but the significance of the lapse of time was something that could be (and was) argued to the jury. The trial court had broad discretion to determine whether the lapse of time made the evidence unduly stale, 2 Wigmore, Evidence Sec. 396 (3d ed. 1940), and we find no abuse of that discretion. As a "trusty" during much of the time in question, Mr. Knowles might well have found it inexpedient to vent his hostility toward Helen Knowles in the manner that had been his wont earlier, but that does not necessarily mean the hostility had evaporated. The testimony placing Mr. Knowles in the parking lot on the morning of April 20, 1982, suggests it had not.
 
 
 33
 The judgment of the district court is AFFIRMED.
 
 
 34
 JONES, Circuit Judge, concurring in result. While I join most of the court's opinion affirming the district court's judgments of conviction as to both defendants-appellants, I write separately to express my reservations as to a portion of Part II of the per curiam opinion. Specifically, I question the necessity of ruling that appellant Knowles did not suffer substantial prejudice from the pre-indictment delay of some 32 months.
 
 
 35
 As the court's opinion explains, the Fifth Amendment's due process clause requires dismissal of an indictment for pre-indictment delay "'only when the defendant shows substantial prejudice to his right to a fair trial and that the delay was an intentional device by the government to gain a tactical advantage."' United States v. Greene, 737 F.2d 572, 574 (6th Cir. 1984) (quoting United States v. Brown, 667 F.2d 566, 568 (6th Cir. 1982) (per curiam) (emphasis added)). A defendant must make both showings in order to establish a due process violation. United States v. Lovasco, 431 U.S. 783, 790 (1977); United States v. Duncan, 763 F.2d 220, 222 (6th Cir. 1985).
 
 
 36
 In the case at bar, as in Greene, 737 F.2d at 574-75, this court concludes that appellant Knowles failed to make any showing that the government's delay in seeking an indictment against him was an intentional and unfair tactical ploy. In my opinion, our Fifth Amendment discussion should have ended there. However, unlike the opinion in Greene, the instant per curiam goes on to reject appellant Knowles' claim of prejudice. I am very much troubled by the court's analysis on the latter point.
 
 
 37
 Initially, the per curiam suggests that since Knowles knew he was a suspect in the bombing attempt five months after the incident, he should have taken steps at that time to build his defense and line up any alibi witnesses. It is doubtful that a criminal defendant's due process rights are contingent on his initiating reasonable investigative measures in his own defense well before he is even indicted. More disburbing, however, is the per curiam's suggestion that the memory failure of Knowles' would-be alibi witnesses caused by the long delay is not prejudicial merely because there was eye witness testimony placing him at the scene of the crime. That is a suggestion with which I respectfully disagree. It seems to me that the prejudice flowing from the inability of an alibi defense witness to "recall accurately events of the distant past" is obvious. Barker v. Wingo, 407 U.S. 514, 532 (1972). Furthermore, I am not sure what would have been gained had Knowles called the jailors to testify as to their failed memory. As the Court said in Barker, "what has been forgotten can rarely be shown." Id.
 
 
 38
 Suffice it to say that I think the issue of whether appellant Knowles suffered substantial prejudice from the 32-month pre-indictment delay is a very close question of constitutional law. Moreover, given the court's holding that the delay was not for an improper purpose, it is an issue that we need not and should not address at this time.