UNITED STATES of America,
Plaintiff-Appellee,

v.

Walter Carson DUNN, Jr.,
Defendant-Appellant.

No. 85–5572.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 24, 1986.
Decided Nov. 24, 1986.

Kemper B. Durand (argued) (court-appointed), Thomason, Hendrix, Harvey, Johnson, Mitchell, Blanchard, Adams, Memphis, Tenn., for defendant-appellant.

W. Hickman Ewing, Jr., U.S. Atty., Memphis, Tenn., Dan L. Newsom (argued), for plaintiff-appellee.

Before ENGEL, KENNEDY and RYAN, Circuit Judges.

RYAN, Circuit Judge.

Walter Dunn appeals his jury conviction of three counts of mail fraud in violation of 18 U.S.C. §§ 1341–1342. Six poultry buildings on Dunn's farm were destroyed by a fire which was intentionally ignited. The government's theory was that Dunn set the fire and committed the mail fraud offenses when he mailed insurance claims for the losses to three insurers.

On appeal, Dunn cites three grounds for reversal:

(1) The admission into evidence of his prior criminal conduct;

(2) The district court's refusal to order the United States attorney to supply him with the transcript of a polygraph examination administered to a prosecution witness prior to trial;

(3) The district court's undue emphasis on Dunn's testimony in its charge to the jury.

We conclude that Dunn's argument on the first issue is well taken. We therefore reverse the conviction and remand the case for a new trial.

On March 7, 1981, six poultry buildings were destroyed by fire on Dunn's property, known as the Sugar Hill Farm, located in Fayette County, Tennessee. Dunn was in the wholesale egg supply business, and the buildings were used to house the producing hens. The buildings destroyed were roughly the same size, 32 feet wide and 456 feet long, and of the same construction, wood frame with chicken-wire sides and a tin roof. While no chickens were in the buildings at the time of the fire, each building could house approximately forty thousand chickens.

Dunn did not dispute the government's claim that the fires were intentionally set, but argued that they were started by someone seeking revenge against him. Fire investigators concluded that six to eight fires were started in each of the six buildings. The fires were ignited by piling paper egg containers, known as egg flats, against the interior walls of the buildings, soaking the egg flats with diesel fuel and lighting the flats from outside the building using rolled-up newspapers introduced through the chicken-wire wall of the building.

Dunn operated as a contract egg producer for Delight Egg Farms (Delight). Under the agreement, Delight supplied Dunn with chickens and feed, while he furnished the poultry buildings, equipment, and labor to collect the eggs and deliver them to Delight's warehouses. Delight owned all the eggs produced by its chickens and paid Dunn five and one-half cents for each dozen eggs delivered to its warehouses.

In December 1980, Delight notified Dunn that it was losing money on its investment at Sugar Hill Farm and that it was contemplating termination of the egg-producing agreement. On February 25, 1981, Delight terminated the contract with Dunn and sent crews in to collect the hens on his land. By March 3, 1981, Delight had reclaimed all but twenty of its hens.

It was, of course, necessary to the government's case that it be shown that Dunn was the arsonist. The evidence against him was essentially circumstantial. By his own admission, he was having financial difficulties. At the time of the fires, he had debts of more than one million dollars. When Delight cancelled the contract, Dunn was left with no income and substantial debts outstanding on the poultry buildings and egg-producing equipment. Because his debts exceeded the insurance value of the buildings, Dunn would not receive any of the insurance proceeds payable because of the loss of the buildings, but the proceeds would reduce the amount of his debts.

Dunn kept a number of back issues of the *Wall Street Journal* in his office, which was located in one of the poultry buildings. A partially burned, rolled-up *Wall Street Journal* was found inserted into the wire wall of one poultry building. In the days preceding the fire, Dunn purchased seven or eight five-gallon containers of diesel fuel. While a solution of diesel fuel and water could be used to clean the chicken coops, the quantity of diesel fuel Dunn purchased exceeded the amount necessary for a normal cleaning of the six poultry buildings.

The paper egg flats used to ignite the fire were no longer used by Dunn in his day-to-day operations. Dunn testified that on the day before the fire, there were no paper egg flats stacked against the interior walls of the poultry buildings. This testimony was contradicted by William A. "Buck" Sides and Jonas Johnson, who entered the poultry buildings on the night of March 5, 1981, with Dunn's permission, to

catch stray chickens. They both testified that crates and egg flats were piled at the ends of each building and were stacked against interior walls.

Four insurance policies covering the property destroyed in the fire had been issued to Dunn by three different insurers. After the fire, he submitted proof of loss documents on all four policies to his insurance adjuster, who forwarded the documents on Dunn's behalf to the three insurance carriers by United States mail. Dunn's prosecution for mail fraud followed.

At trial, Dr. William Treat, a principal of Delight, was called as a witness by the government. On direct examination, Dr. Treat stated that Delight cancelled its contract with Dunn because it was losing between $150.00 and $200.00 per day on the contract.

Dr. Treat kept a business diary. On cross-examination, after referring to an entry in the diary on March 7, 1981, defense counsel asked Dr. Treat if he had been responsible for the fire:

"Q. I find it facsinating [sic] that you, the first entry that you have on March the 7th is "fire—Sugar Hill Farm," is that something that you had planned to do on that date?

"A. I don't know what your reference is to, sir.

"Q. Well, the reference apparently in your book is that you were planning to do something or something happened on March 7th, which is a Saturday, and the very first reference in your book is fire—Sugar Hill Farm, were you planning to burn it?

"A. I think that you are not reading all of what is there.

"Q. Doesn't it say fire—Sugar Hill Farm?

"A. It says Sugar Hill Farm fire per Gurkin's.

"Q. Per Gurkin's, Pit Gurkin is a person who owns a grocery store in that area, owns several grocery stores?

"A. That is correct.

"Q. You don't mean to imply by that entry in your diary that you burned this farm, did you, or had anything to do with it?

"A. No, sir.

"Q. Or that Mr. Gurkin burned it?

"A. Not to my knowledge. My son works for Mr. Gurkin, and has for several years, he works on the weekends, Friday nights and Saturday nights as a clerk, and it has down here per Gurkin's and son, my son called me early Saturday morning after I got to the office to tell me that Mr. Gurkin had told him that the chicken houses out at the Sugar Hill Farm had burned."

In addition, defense counsel asked Dr. Treat about the competition between Delight and RusDun Farms, an egg-producing company owned by Walter Dunn's cousin, Melvin Russell, and, specifically, whether Delight lost two of its biggest customers, Montesi's Market and Seessel's Market, to RusDun Farms just prior to the fire at the Sugar Hill Farm:

"Q. When was it that Mr. Meyer told you that you had just lost the Montesi account, how soon before March the 7th, 1981?

"A. If it was in '81 that Montesi closed, I don't recall.

"Q. I'm not talking about them closing, that was Christmas a year ago, Christmas 1983 approximately. In 1981 in very late February or March, very early March, before March 7th, isn't it a fact that your company lost the account at Montesi?

"A. I don't recall the date, somewhere probably '81 or '82, yes.

"Q. Do you disagree with me or you don't recall?

"A. I don't recall. I don't recall the exact time that the egg purchases were switched from Delight Egg Farms to RusDun Farms. Prior to that switch, however, Montesi had

been buying eggs from the RusDun Farm for over a year, probably at least 25, maybe 25 to 30, 40 percent of their eggs.

"*Q.* All right. RusDun Farms is the name of the egg farm owned by Walter Dunn's cousin, Melvin Russell, isn't that correct?

"*A.* That is correct.

"*Q.* Okay. Now, how much before March 7, 1981, did you learn that your company, Delight Eggs, had also lost the Seessel's account?

"*A.* I don't recall. However, if you are referring to the impact that the Seessel's accounts would have on a business such as ours, it was very, very small.

"*Q.* And the company that picked up both the Seessel's and the Montesi account was RusDun Farms, Mr. Melvin Russell, isn't that correct?

"*A.* That is correct."

Dr. Treat was also asked if Delight had hired a private investigator to investigate Melvin Russell immediately after the fire at the Sugar Hill Farm.

After Dr. Treat was excused from the witness stand, the government sought permission to recall him in order to establish that one of the reasons Delight cancelled its contract with Dunn was its suspicion that he was stealing eggs produced by Delight's hens, selling them privately, and retaining the proceeds. The government argued that introduction of evidence that Dunn stole eggs from Delight was necessary to rebut the defense's theory, established on cross-examination of Dr. Treat, that Delight, in reprisal for the loss of two of its largest accounts to Dunn's cousin, cancelled its contract with Dunn and burned the poultry buildings on the Sugar Hill Farm.

The district court ruled that the evidence that Dunn was an egg thief would be received, concluding that the evidence was relevant under Rule 401. The court stated:

"[I]f your position is that you are presenting this evidence in the form of rebuttal to testimony that has already been given about egg losses and why the contract was ultimately terminated, then on that basis I think it is relevant."

The court later denied Dunn's motion to exclude the testimony of witnesses other than Dr. Treat on the issue of his egg thievery. The court observed:

"Well, Mr. Durand, I understand your position, it is just that the court does not accept your position, I think the government can show these facts and certainly we are dealing with a mail fraud case, the underlying offense is arson, but you have injected into this case some other elements, and that is that not Mr. Dunn but possibly Dr. Treat or someone acting for or on his behalf may have been responsible for this fire, and this has brought into issue some matters relating to contracts, why those contracts were canceled, and I think they are relevant on these underlying issues that are inherent in a case of this kind."

Thereafter, Dr. Treat and three other witnesses testified that Dunn illicitly sold Delight's eggs for his own profit.

Initially, Dunn contends that the only arguable basis upon which evidence that he stole eggs from Delight could have been admitted was under Fed.R.Evid. 404(b) [1] as proof of "other crimes, wrongs, or acts" for one of the purposes allowed under the rule, and that even if evidence of his egg thefts was relevant rebuttal evidence, its probative value was "substantially outweighed by the danger of unfair prejudice" and was thus inadmissible under Fed.R. Evid. 403. [2]

---

1. Fed.R.Evid. 404(b) provides:
   "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

2. Fed.R.Evid. 403 provides:
   "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the

The government responds that it did not, at trial, and does not now, claim that the evidence of Dunn's stealing was admissible under Fed.R.Evid. 404(b). That does not mean, of course, that the provisions of Rule 404(b), which severely restrict the admissibility of evidence of "other crimes, wrongs, or acts," are not now applicable to these proceedings.

▆▆▆▆ While rebuttal is not one of the purposes listed in Rule 404(b) for which evidence of other crimes may be used, "[R]ule 404(b) is not to be interpreted mechanically, and under its flexible guidelines even dissimilar crimes can be admitted in certain special situations." *United States v. McFadyen-Snider*, 552 F.2d 1178, 1183 (6th Cir.1977). When other crimes allegedly committed by the defendant are introduced for a purpose other than those explicitly listed in Rule 404(b), the evidence must nonetheless be subjected to Rule 404(b) inquiry in order to ensure that it is not used to show that, on the occasion in question, the accused "acted in conformity therewith," or to show the defendant's bad character or criminal propensity. In addition, even if the evidence survives Rule 404(b) scrutiny, it must be clear that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice under Rule 403:

> "In reviewing the admission of evidence challenged under Rule 404(b), we must make two determinations. First, we must decide whether [the evidence] was admissible for any *proper* purpose, as distinct from the *improper* purpose of showing 'character' or 'propensity.' If we conclude that there was a proper basis for admission, we must then consider whether the probative value of the evidence outweighed its potential prejudicial effects. In the second instance, the standard of review on appeal is whether the trial judge abused his discretion in admitting the evidence."

*United States v. Dabish*, 708 F.2d 240, 242 (6th Cir.1983) (quoting *United States v. Vincent*, 681 F.2d 462, 465 (6th Cir.1982)) (emphasis in original), (citations omitted).

Although we have some difficulty understanding the government's theory to explain the admissibility of the egg stealing evidence, apparently it is that the evidence was admissible for two reasons: (1) it was relevant to rebut the inference raised by Dunn that Delight was losing money and cancelled the contract with Dunn *because* it had lost two good customers to Dunn's cousins, whereas, in truth, it cancelled the contract because Dunn was stealing its eggs,[3] and (2) it was relevant to rebut the defense's inferential claim that Dr. Treat and his associates had a motive to burn Dunn's buildings.[4]

We think the evidence of Dunn's wrongdoing should not have been admitted upon either theory offered by the government.

---

jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**3.** At p. 20 of its brief, the government states:

"Of Course [*sic*], Dr. Treat did not testify that the cancellation of the defendant's contract was because of competition against them by his cousin, Melvin Russell. This is because it was not the reason. Therefore you certainly will not find such testimony coming from Dr. Treat. A careful reading of the entire cross-examination of Dr. Treat, however, strongly suggests that such was the case *and this was precisely what the government was moving to rebutt [sic]*." (Emphasis added.)

**4.** At p. 16–17 of its brief, the government states:

"The government further expressed to the [trial] Court that the interjection of these inferences through Dr. Treat was misleading to the jury in that it suggested, as it then stood, a motive for someone else to have caused the fire, when in fact, there was clear rebuttal to that suggestion by allowing the jury to hear the 'complete' reason for the cancellation of Dunn's contract."

In addition, at p. 16 of its brief, the government stated that it "expressed its position" to the trial court concerning the admissibility of the egg-stealing evidence, and the court then "came to the same conclusion":

"'The Court: Well, yesterday though, in examining the doctor, you did a fairly good job of presenting evidence that would inferentially give the impression that there may have been something of a competitive situation here in this egg business and that this doctor or someone associated with him may have caused this burning.'"

■ Taking the second basis first, if the uncharged misconduct was offered to rebut the notion that Delight had a motive to start the fire, it was simply irrelevant. Proof that the defendant was stealing from Delight has no logical tendency, no *probandum*, to rebut the inference, circumstantially established by defendant, that Delight had a motive to burn down the buildings in order to punish the defendant. Indeed, such evidence would have just the opposite tendency: learning that Dunn was stealing from it would reinforce any motive Delight might have to punish Dunn by burning down his buildings.

On the other hand, if the evidence of egg stealing was offered to rebut Dunn's claim that the *reason* the contract with Dunn was cancelled was the loss of business to defendant's cousin, and to establish that the real reason was because Delight no longer wished to deal with a thief, then the evidence was indeed logically and legally relevant. The problem then becomes whether, despite its relevancy, it is admissible. We think its admission is forbidden because its probative value was substantially outweighed by its unfair prejudice.

Fed.R.Evid. 402 declares, essentially, that evidence is admissible if it is "relevant." Fed.R.Evid. 401 states that " 'Relevant evidence' means evidence having any tendency to make the existence of *any fact that is of consequence to the determination* of the action more probable or less probable than it would be without the evidence." (Emphasis added.)

■ Notably missing from the Federal Rules of Evidence, some say lamentably so, is any definition or specific reference whatever to the concept of materiality. At common law it was generally thought that it was not sufficient, for purposes of admissibility, that evidence be merely relevant; that is, that it have a tendency to make *the proposition for which it is offered* more probably so than if the evidence had not been offered. That was, and is, relevancy at common law. To be admissible, the proposition for which the relevant evidence is offered must be material; that is, the proposition to be proved must be a matter or issue in dispute in the case. The proposition to be proved, to be "material" or "in dispute in the case," need not be an element of a crime or cause of action or defense but it must, at least, be "in issue" in the sense that it is within the range of litigated matters in controversy.

To borrow an example from Professor McCormick, in a suit for worker compensation benefits, evidence of the claimant's contributory negligence would be immaterial in the sense that it would not be "of consequence to the determination of the action" and not within the range of matters in dispute, because contributory negligence in a worker compensation case does not affect entitlement to benefits. Therefore, in such a case, while evidence that the claimant was negligent in the manner in which he performed his task might be relevant to show who was at fault for his injury, such evidence would not be admissible because of its immateriality. McCormick on Evidence, § 185 (E. Cleary 3d ed. 1984).

In the Federal Rules of Evidence, the notion of materiality is subsumed in the definition of "relevant evidence" in Rule 401 in that it is declared there that "relevant evidence" must, for example, not only "make the existence of any fact [for proof of which the evidence is offered] more probable ... than it would be without the evidence," but, in addition, the fact to be proved must also be "of consequence to the determination of the action"; that is, material.

Here, the relevancy of evidence of Dunn's egg stealing is its tendency to contradict the inference that the *reason* Delight cancelled the contract with Dunn was its loss of business to RusDun Farms, and to suggest instead that the reason for the loss of business was the defendant's theft of its property. The egg stealing is relevant, therefore, under Rule 401 if the *reason why* Delight cancelled the contract is a "fact that is of consequence to the determination of the action"; that is, material. Plainly, the materiality of the "real reason" why the egg-producing contract was can-

celled, its "consequence to the determination of the action," was extremely tenuous, remote, and insubstantial. While the question whether Delight did or did not have a motive to burn down the building was "of consequence" to the case, the *reason why* the contract was cancelled was not a matter seriously in controversy and certainly not a matter of any consequence to the determination of the prosecution. It was agreed that the contract was cancelled. There was no dispute about that. Consequently, the reason why it was cancelled was of no importance whatever.

■ Dunn's evidence, tending to show that Delight was losing money, lost two of its accounts to his cousin, and had an inordinate interest in the fire, was not offered to show the "reason" the contract was cancelled; it was to show a motive Delight might have for burning down the buildings. We conclude, therefore, that the evidence that Dunn was a thief was not admissible to show the "real reason" *why* the contract was cancelled because "why" the contract was cancelled "was not a fact of consequence to the determination of the action." It should have been excluded by the trial court merely by reason of the correct application of Fed.R.Evid. 401.

■ We recognize, of course, that the trial court has broad discretion in determining the relevancy of evidence and in passing upon its admissibility under Rule 401, and, therefore, its ruling should be accorded substantial deference in this instance. Conceding that, even if the trial court arguably did not abuse its discretion in determining that the egg-stealing evidence was relevant, we think it is plain that the evidence was substantially more unfairly prejudicial than probative and was therefore inadmissible under Fed.R.Evid. 403.

To repeat, the rule states:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The probative worth to the jurors of hearing that, from Delight's point of view, there was a different reason why the contract was cancelled and why Delight was losing money than the reason being offered by the defendant, was manifestly and substantially outweighed by the unfair impact upon the defendant of the jurors learning that he was a thief; conduct for which he was neither charged nor convicted.

The prejudice to the defendant was exacerbated by the argument of the United States attorney who, on two separate occasions, urged the jury to consider the evidence of defendant's wrongdoing for the very purpose for which Rules 404(a) and 404(b) forbid such evidence to be used.

Fed.R.Evid. 404(a) begins:

"Character Evidence Generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion...."

Fed.R.Evid. 404(b) begins:

"Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith...."

While the government did not acknowledge at trial, and does not claim now, that the evidence of Dunn's dishonesty was offered for the purpose of proving a "pertinent trait of his character" under Rule 404(a), or to prove "other crimes, wrongs, or acts" under Rule 404(b), in order to show that Dunn "acted in conformity therewith" in burning down the buildings, the fact is that the government used the evidence in the United States attorney's argument to the jury for those very purposes— purposes explicitly forbidden by those rules—to show that the defendant is a person possessed of the traits of character of a thief; that he is the kind of person who would have the propensity to commit the crime with which he was charged in this case; and that he very likely "acted in

conformity [with that character trait] on [this] particular occasion."

The United States attorney argued:

"Now, what *kind of fellow* do you have? You know you do have a right as jurors to use your common sense and *look into the person* that you are dealing with. What do we know about him? We know one thing about him for sure now he hasn't called it stealing, ladies and gentlemen, but maybe there is another definition for selling, I don't know, but I submit to you that when somebody entrusts something to your trust and then you flat out take it and sell it for your own profit." (Emphasis added.)

Later, the United States attorney argued (apparently sarcastically):

"He wasn't stealing them, ladies and gentlemen, now that wasn't theft, he is not a thief. And he told James Wright 'James, you watch about who you deal with, don't deal with any strangers.'

"He is not on trial for that, ladies and gentlemen, I don't want you to think that he is on trial. But I do say this, you have a right to consider that in determining *what kind of character you have here*, what *the character of this individual* is and *whether or not he would have that type of inclination to do something dishonest*, ladies and gentlemen." (Emphasis added.)

■ Thus, it is seen that regardless of the theories suggested by the government at trial for the admissibility of the evidence of the defendant's wrongdoing, and regardless of the rationale advanced here on appeal, it is plain from the record that the government used the evidence for a reason explicitly proscribed by Fed.R.Evid. 404(a) and 404(b): to suggest that the defendant is a bad person, having a propensity to criminal conduct, who is the "kind of fellow" having the "kind of character" and the "type of inclination to do something dishonest," who the jurors could expect would be guilty of the offense charged in the indictment.

The evidence was so unfairly prejudicial, and so substantially outweighed any marginal "relevancy" it might have had under Fed.R.Evid. 401, that the defendant's conviction must be set aside.

Although our disposition of the case renders unnecessary any further discussion of the remaining assignments of error, we nevertheless address appellant's claim concerning the jury instructions because the issue may arise on retrial.

Appellant complains of the manner in which the trial court organized the jury instructions, and of an "undue emphasis upon the defendant as a witness" and upon the defendant's character. Appellant specifically disavows, however, any complaint concerning "the language used by the court, for the legal accuracy of the statements he has not challenged."

Appellant cites no authority in support of his complaint concerning the jury instructions.

■ We have carefully examined the court's entire charge to the jury and are satisfied that it is supported by the evidence in the case, correctly states the law, and presents the issues to the jury in a fair and impartial manner without undue or unfair emphasis. The general organization of the jury instructions is a matter within the trial court's discretion, a discretion fairly and wisely exercised in this case.

The judgment of conviction is reversed.

ENGEL, Circuit Judge, dissenting.

I respectfully dissent. My reading of the record leads me to conclude that the trial judge did not commit reversible error in allowing proof concerning Dunn's conduct in selling eggs which were under contract with Treat to others. The majority seems to conclude upon the same record that there was little if any relevancy because proof that defendant was stealing from Chicken Delight had no logical tendency "to rebut the inference, circumstantially established by defendant, that Delight had a motive to burn down the buildings in order to punish the defendant. Indeed, such evidence would have just the opposite tendency: learning that Dunn was stealing from it would reinforce any motive Delight

might have had to punish Dunn by burning down his buildings." The district judge took a different view as has been candidly acknowledged in the majority opinion. About all that is apparent from this is that different persons could draw different conclusions from this evidence. In such a circumstance I am inclined to uphold the decision of the trial judge who was present at the time and heard all of the testimony and proof live and who therefore had an opportunity to judge and make the balancing test in determining whether the evidence should or should not be excluded. He obviously did apply such a test, concluded that it had some relevancy and that its probative value outweighed its prejudicial effect.

Beyond that it seems to me that if the majority here is correct and if therefore the evidence would reinforce any motive Delight might have had to punish Dunn by burning down his buildings, to that extent, it was supportive of Dunn's defense and would in any event be harmless if indeed it was error.