Marvin MILLER, Appellant,

v.

The STATE of Texas, Appellee.

Reginald Keith Leroy, Appellant,

v.

The State of Texas, Appellee.

Nos. 01–03–01035–CR, 01–03–01038–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Nov. 10, 2004.

Roland B. Moore, III, Houston, TX, for Appellant.

Charles A. Rosenthal, Jr., District Attorney–Harris County, Bridget Holloway, Assistant District Attorney–Harris County, Houston, TX, for Appellee.

Panel consists of Justices TAFT, JENNINGS, and BLAND.

## OPINION

TERRY JENNINGS, Justice.

In a joint trial, a jury found appellants, Marvin Miller and Reginald Keith Leroy, guilty of the offense of aggravated robbery. After finding true the allegations in two enhancement paragraphs in each case that appellants each had two prior felony convictions, the trial court assessed Miller's punishment at confinement for 25 years and Leroy's punishment at confinement for 40 years. In five issues, appellants contend that the trial court erred in denying their requests to have an interpreter appointed to assist the complainant in testifying, that the evidence is legally and factually insufficient to support their convictions, and that their trial counsel rendered ineffective assistance in not objecting to leading questions. In a sixth issue, Leroy contends that his trial counsel rendered ineffective assistance in eliciting adverse testimony on cross-examination. We reverse both convictions and remand.

### Facts

Oscar Cardenas, the complainant, testified that, on January 24, 2003, at approximately 6:00 p.m., he was working part-time for a maintenance crew cleaning an office building, and he unlocked the door to the offices of Apogee Engineering (Apogee). When he entered Apogee's offices to vacu-

um, he noticed papers strewn all over the floor and saw a man whom he later identified as Miller. The complainant testified that Miller immediately walked over to him, pulled out a knife, grabbed him by the neck, and said "if you scream, I hit you, I kill you." The complainant complied with Miller's order because he feared that Miller would "kill [him]." Miller subsequently called out to a man, whom the complainant later identified as Leroy, who was hiding in an access tunnel above Apogee's offices. Leroy then "came through the ceiling" into the office.

At this point, Leroy began looking through the drawers of a desk in the office, while Miller continued restraining the complainant. After approximately 30 minutes, Leroy picked up a glass clock. Miller took the keys to Apogee's offices from the complainant and unlocked the door. Miller and Leroy then left the office, closed the door behind them, and slid the keys underneath the door. When the complainant subsequently left the office, he saw Miller and Leroy get into a red or maroon Cadillac, which had been parked outside the building, and drive away. The complainant then located his supervisor and told her what had happened, and the supervisor called for emergency assistance.

Byron Dearixon, Apogee's owner, testified that, when he inspected his office after the robbery, he discovered that a clock and five checks were missing. Dearixon could not recall the amount of each check, but he remembered that one of the checks had been made out to Apogee in the amount of $6,812.60. During his inspection, Dearixon also saw that two tiles were missing from the ceiling of his office and he took this as a sign that the robbers had entered his office by climbing over from an adjacent office space that was being renovated. Dearixon explained that, because the door to this other office space had been left open to "air out" the space, a person could have entered the office space, climbed up to the access tunnel above it, and then entered his office by removing some of the ceiling tiles.

Shawndale Jones, an employee at Ace Check Cashing, testified that, on January 27, 2003, three days after the robbery, Miller and Leroy entered the check cashing store, and Leroy handed Jones a check and his driver's license and asked her to cash the check. Jones saw that the check had been made payable both to Apogee and to Leroy and that Leroy's name had been added to the check using a typewriter. Instead of cashing the check, Jones "hit [her] panic button so the police would come to the location."

Houston Police Officer K. Flowers testified that, on January 27, 2003, after he was dispatched to Ace Check Cashing, he arrested Miller and Leroy and obtained the check from Jones.

Harris County Sheriff's Detective T.L. Keen testified that, after he obtained separate photographs of Miller and Leroy, he compiled two separate photographic arrays: one consisting of a photograph of Miller and the photographs of five other men and the other consisting of a photograph of Leroy and the photographs of five different men. On January 28, 2003, when Keen showed the complainant the arrays, he positively identified Miller and Leroy as the robbers.

### Legal Sufficiency of the Evidence

In their second and third issues, appellants argue that the evidence was legally insufficient to support their convictions because the State failed to prove that they had committed the robbery while using or exhibiting a deadly weapon or that they had placed the complainant in fear of imminent bodily injury or death.

We review the legal sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict to determine if any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim. App.2000). Although our analysis considers all evidence presented at trial, we may not reweigh the evidence and substitute our judgment for that of the fact finder. *Id.*

A person commits the offense of robbery if, in the course of committing theft and with the intent to obtain or maintain control of property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. TEX. PEN.CODE ANN. § 29.02 (Vernon 2003). A person commits the offense of aggravated robbery if he commits robbery and uses or exhibits a deadly weapon. *Id.* § 29.03(a)(2) (Vernon 2003).

Under the law of parties, a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. *Id.* § 7.01(a)(2) (Vernon 2003). A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2) (Vernon 2003). Each party to an offense may be charged with commission of the offense. *Id.* § 7.01(b) (Vernon 2003).

### Deadly Weapon

■ A deadly weapon is defined as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *See id.* § 1.07(a)(17)(B) (Vernon 2003). Although a knife is not a deadly weapon per se, a knife can be found to be a deadly weapon based on the nature of its use or intended use. *Garcia v. State*, 17 S.W.3d 1, 4 (Tex. App.-Houston [1st Dist.] 1999, pet. ref'd). To determine whether a particular knife is a deadly weapon, courts have considered (1) the size, shape, and sharpness of the knife; (2) the manner of its use or intended use; (3) the nature or existence of inflicted wounds; and (4) testimony about the knife's life-threatening capabilities. *Id.*

■ Appellants assert that the State failed to prove that the knife used by Miller was a deadly weapon because (1) "the State did not introduce a knife into evidence"; (2) "[no] witness testified as an expert to say that in his opinion the [knife] was capable of causing serious bodily injury and death"; and (3) "[n]o testimony established that the [knife] ... was manifestly 'designed, made, or adapted' for the purpose of inflicting bodily injury." Appellants note that the complainant testified that Miller told him not to scream or that Miller would "kill [him]." However, appellants argue that this testimony should be ignored because it was the "product of an improper leading question" and was unreliable due to the complainant's "hopeless lack of understanding of English."

However, the complainant testified that, when he entered Apogee's offices and saw that Miller was inside, Miller pulled out a knife, grabbed the complainant by the neck, and stated, "If you scream, I hit you, I kill you." The complainant testified that he complied with Miller's order because he was afraid that Miller would "kill [him]." Thereafter, Leroy "came through the ceiling" into the office, and, while Miller continued to restrain the complainant and to exhibit the knife, Leroy searched through the drawers of the desk for items to steal. Considering this evidence, a rational fact finder could have found, beyond a reason-

able doubt, that, based on the manner in which Miller used the knife, it was capable of causing death or serious bodily injury and was a deadly weapon. TEX. PEN.CODE ANN. § 1.07(a)(17)(B). Moreover, a rational fact finder could have also found, beyond a reasonable doubt, that Leroy, intending to assist Miller in the commission of the robbery, had aided Miller and was, therefore, criminally responsible for Miller's exhibition of the knife. *See id.* § 7.02(a)(2).

## Fear of Imminent Bodily Injury or Death

■ Appellants also contend that the State failed to prove that they "threatened or placed the complainant ... in fear of imminent bodily injury or death." Appellants assert that, "although the complainant testified that he was in fear of serious bodily injury or death, he suffered no wounds, the knife was not introduced into evidence, and the State had failed to establish its potential for harm through expert testimony by a Houston police officer."

However, as conceded by appellants, the complainant did testify that, when Miller grabbed him by the neck, held a knife by his side, and stated, "If you scream, I hit you, I kill you," he feared that Miller would indeed "kill [him]." The complainant further testified that he did not return to work for a week because he was still afraid. Considering this evidence, a rational fact finder could have found, beyond a reasonable doubt, that Miller had placed the complainant in fear of imminent bodily injury or death.

Accordingly, we hold that the evidence was legally sufficient to support appellants' convictions.

We overrule appellants' second and third issues.

## Appointment of an Interpreter

In their first issue, appellants argue that the trial court erred in denying their requests to have an interpreter appointed to assist the complainant in testifying because the complainant "could not speak English well enough to be reliable" and "could not be effectively cross-examined [as] he could neither understand the questions, or repeat many answers that [had] been attributed to him by the investigating officer."

■ The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. This "bedrock procedural guarantee" applies to both federal and state prosecutions. *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 1359, 158 L.Ed.2d 177 (2004). Likewise, the Texas Constitution guarantees that "[i]n all criminal prosecutions the accused shall ... be confronted by the witnesses against him." TEX. CONST. art. I, § 10. Cross-examination has been described as "beyond any doubt the greatest legal engine ever invented for the discovery of truth ... the great and permanent contribution of the Anglo–American system of law to improved methods of trial procedure." JOHN H. WIGMORE, A TREATISE ON THE SYSTEM OF EVIDENCE IN TRIALS AT COMMON LAW 2, at 1697–98 (1904).

■ The Texas Court of Criminal Appeals has acknowledged that providing an interpreter to an accused who does not understand English is required by the Confrontation Clause and by Article I, section 10. *Baltierra v. State*, 586 S.W.2d 553, 556–59 (Tex.Crim.App.1979). Likewise, we hold that providing an interpreter to an accused to confront a material witness who does not understand English is required by the Confrontation Clause and by Article I, section 10. These confronta-

tion guarantees are simply lost to an accused who, because of a language barrier, is deprived of the ability to test the credibility of a material witness through cross-examination.

We also note that Article 38.30 of the Texas Code of Criminal Procedure provides, in pertinent part, as follows:

> When a motion for an interpreter is filed by any party or on motion of the court, in any criminal proceeding, *it is determined that a person charged or a witness does not understand and speak the English language,* an interpreter *must* be sworn to interpret for him.

TEX.CODE CRIM. PROC. ANN. art. 38.30(a) (Vernon Supp.2004–2005) (emphasis added). This provision is designed to protect an accused's right of confrontation under the federal and state constitutions. *Montoya v. State,* 811 S.W.2d 671, 673 (Tex. App.-Corpus Christi 1991, no pet.).

Appellants direct our attention to numerous "passages of testimony when [the complainant] spoke at trial that prove, even from the 'cold record,' that he was not competent to testify in English." Specifically, appellants note that, on direct examination, the complainant did not understand several of the State's questions, prompting the State to rephrase the questions in leading form. Appellants also note that, on cross-examination, the complainant testified that he did not speak English as well as he could speak Spanish. Thus, appellants conclude that the complainant's command of English was so poor that appellants could not (1) "cross-examine the complainant effectively" or (2) "counteract the effect of the leading questions from the State."

The State asserts that appellants waived their confrontation rights by "untimely" requesting an interpreter for the complainant. Moreover, citing *Diaz v. State,* 491 S.W.2d 166 (Tex.Crim.App.1973), the State argues that there is no reversible error here merely because the complainant did not speak fluent English. The State emphasizes that the trial court allowed both the State and the defense latitude in questioning the complainant and asserts that the complainant was able to communicate in English the facts underlying the robbery.

However, the Court of Criminal Appeals has recently concluded that "when a trial judge is aware that [a] defendant has a problem understanding the English language," his right to have an interpreter translate the trial proceedings into a language that he understands is a right "which must be implemented by the system unless expressly waived." *Garcia v. State,* 149 S.W.3d 135, 145 (Tex.Crim.App. Mar. 24, 2004). The Court explained that

> [i]n these circumstances, *the judge has an independent duty to implement this right* in the absence of a knowing and voluntary waiver by the defendant. The judge may become aware of the defendant's language problem either by being informed of it by one or both parties or by noticing the problem *sua sponte.*

*Id.* (emphasis added). In *Garcia,* the Court noted that, because the trial court "was aware that Garcia had difficulty understanding English," it was "required to ensure that the trial proceedings were translated into a language which Garcia could understand, absent an effective waiver by Garcia." *Id.* The Court held that, because Garcia did not knowingly or voluntarily waive his right to an interpreter, his Sixth Amendment right to confront witnesses was violated. *Id.* We find that this reasoning applies equally to material witnesses who have a problem understanding the English language.

■ Here, the record reveals that the complainant had great difficulty answering

the State's questions on direct examination and that the trial court allowed the State to examine the complainant with numerous leading questions. During the cross-examination of the complainant by Leroy's counsel, the following colloquy concerning the complainant's ability to testify in English occurred outside the jury's presence:

[Counsel for Leroy]: Your honor, I do not know whether or not his ability is linguistics, in the fact that he does not understand English well enough to answer the questions, or whether or not he has some mental deficiencies that prevents [sic] him from answering the questions, Your Honor. At this point, I think it's abundantly clear he is not competent enough to testify adequately and thoroughly in the English language, your Honor.

[Trial Court]: That will be overruled at this point. You just have to do the best you can, just like the State did. So, anything else.

[Counsel for Miller]: That's all. I concur with that request, Judge, that this young man needs to testify through an interpreter instead of through the English language.

After a recess, the trial court stated:

All right. For the record, *the Court has made attempts to locate an interpreter.* I had no idea this was necessary where I sit. We certainly could have had an interpreter. *We probably should have had an interpreter*, but I can't get one this afternoon. I'm not going to waste the jury's time. So, we're going to continue with this. If y'all want to do whatever you want to do with regard to that, we can deal with that at the appropriate time.

(Emphasis added.) The trial court thus became aware of the complainant's language problem during direct examination, and both appellants requested an interpreter to perform a meaningful cross-examination. Furthermore, the trial court expressed its own concern that an interpreter was needed so that the complainant could testify adequately, and the court stated that it "certainly could have had an interpreter."

We recognize that the trial court did not have the benefit of *Garcia* and was genuinely concerned about delaying the trial. Nevertheless, under *Garcia's* holding and reasoning, once the trial court became aware of complainant's language problem, it had an independent duty to implement appellants' confrontation rights by securing an interpreter to translate for the complainant. Based on the record presented, which demonstrated the complainant's language barrier and the trial court's awareness of that barrier, we hold that the trial court erred in not implementing appellants' confrontation rights under both the Sixth Amendment to the United States Constitution and Article I, section 10 of the Texas Constitution.

■ In regard to our harm analysis, we note that, although the complainant understood and spoke English well enough to describe the robbery and to identify appellants as his assailants, the record demonstrates that the complainant had great difficulty answering simple questions on both direct examination and cross-examination. For example, the following exchange took place on direct examination:

[State]: Now, while you were working in January, did you—did something happen to you in one of the offices?

[Complainant]: No.

[State]: Nothing happened to you?

[Complainant]: I don't understand. Can you repeat it?

When asked, on cross-examination, to describe how the first robber "looked to [the complainant] that night," the complainant

answered, "It was—I can't explain." Then the following exchange occurred:

> [Counsel for Leroy]: Do you remember talking to the officer?
>
> [Complainant]: Yes.
>
> [Counsel for Leroy]: Did you give him a description or did your aunt tell him the description?
>
> [Complainant]: I gave her the description.
>
> [Counsel for Leroy]: Did you tell him—what did you tell him?
>
> [Complainant]: To the police?
>
> [Counsel for Leroy]: Yes.
>
> [Complainant]: I don't know. I don't know how to say it.
>
> [Counsel for Leroy]: You do not know how to say because you don't know the words or you don't remember?
>
> [Complainant]: I don't know the words.

When appellants' trial counsel expressed their frustration with the complainant's language barrier, the trial court acknowledged the problem when it stated, "You just have to do the best you can, just like the State did." The trial court then acknowledged that "[w]e probably should have had an interpreter."

 Because the complainant could not understand certain basic questions posed to him, the ability of appellants' trial counsel to effectively cross-examine the complainant was impeded. Harmless error analysis for Confrontation Clause violations assumes that "the damaging potential of the cross-examination [would have been] fully realized." *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). Here, appellants were effectively deprived of the ability to test the credibility of the complaining witness through cross-examination. Therefore, we cannot find beyond a reasonable doubt that the trial court's error in not implementing appellants' confrontation rights did not contribute to appellants' convictions. TEX.R.APP. P. 44.2(a).

We sustain appellants' first issue.

### Conclusion

Having held that the trial court erred in not implementing appellants' confrontation rights and having concluded that the error was not harmless, we need not address appellants' remaining issues. We reverse the judgments of the trial court and remand these causes to the trial court for further proceedings in accordance with this opinion.