Opinion issued June 21, 2007






 













In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00954-CR

____________


CRAIG LEONARD JUNIOUS, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 185th District Court

Harris County, Texas

Trial Court Cause No. 1018937






MEMORANDUM OPINION

 A jury found appellant, Craig Leonard Junious, guilty of the offense of
aggravated assault, (1) and, after he pleaded true to the allegations in two enhancement
paragraphs that he had two prior felony convictions, the trial court assessed his
punishment at confinement for twenty-five years. In two points of error, appellant
contends that the evidence is legally and factually insufficient to support his
conviction. 

 We affirm.

Factual Background


 Kimberly McGee, the complainant's sister, testified that on March 5, 2005, the
complainant came to her house at around 2:30 or 3:00 a.m. She stated that this was
unusual because normally the complainant spent the whole night with her boyfriend,
appellant, and "we know for a fact when she comes home in the middle of the night
like that, something is wrong." When the complainant arrived at the house, although
not crying, she appeared upset, scared, and nervous. After speaking with the
complainant and going back to bed, Kimberly heard appellant "beating at the door." 
Appellant continued knocking until the complainant went to the front door, and, at
this time, Kimberly got out of bed. After the complainant answered the door, she and
appellant argued. The complainant "was very scared" and told appellant to leave the
house. 

 Kimberly further testified that from the hallway, she could see straight out to
the front door. As she was coming down the hallway, she saw the complainant trying
to get appellant out of the doorway, telling him to "get back, do not come in here." 
Appellant, with his right hand, pulled a knife out of his pocket. Kimberly described
the knife as "[l]ike, a steak knife." The complainant held up appellant's arm, and
appellant appeared to be "[t]rying to stab" the complainant. When asked if she could
tell whether appellant was trying to stab her or the complainant, Kimberly testified,
"At that point it looked like he was trying to stab [the complainant]." Kimberly
explained that, at that instant, she was not close enough to be hit by the knife. Upon
her warning the complainant that appellant had a knife, appellant reacted by "pushing
[the complainant] out of the way and he start[ed] coming for [Kimberly]." 
Kimberly's daughter and daughter-in-law "[h]ollered out and screamed out." 
Kimberly told her daughter to call for emergency assistance, and the complainant's
son eventually tried to help them. Then, after appellant came to Kimberly, they
"squabbled a little bit, with [the complainant] still in between" them. Kimberly tried
"[t]o get the knife away" because it appeared that people were in danger of being cut
and the complainant "was holding the blade of the knife." Kimberly saw the
complainant's hand get cut, but she was unable to remove the knife from appellant's
hand. Eventually, they "fell to the floor" with the complainant "at the bottom,"
appellant "in the middle," and Kimberly "on him." The complainant was "pinned
down" on the bottom, and others in the house held down appellant. When police
officers arrived, they were able to remove the knife from appellant's possession. 
Kimberly explained that appellant's actions made her feel threatened, based not only
on the knife, but also on past events. After appellant's arrest, Kimberly signed an
affidavit of nonprosecution. 

 Jackie McGee, the complainant, testified that on the night of March 5, 2005,
she and appellant had walked to a club and were there for approximately four hours. 
She explained that appellant had been her boyfriend for "about nine or ten months"
and she would spend "[e]very night at his house" and "go home, get some more
change of clothes and . . . go back." While they were at the club, appellant became
upset after the complainant "was hugging on some old mens." She explained that
"[h]e was angry at the club, then [appellant] was still kind of--calmed down when
[they] got to [appellant's] house, but he still kind of angry and he got to want to
fight." After they both lay down to sleep, the complainant got up at 3:00 a.m., left
appellant's house, and walked to her sister's house, located "three or four blocks
away." At the time, she was not afraid, but she went to her sister's house in order to
"let [appellant] cool off" and because she had to go to work the next day. Once
inside, as she was getting ready to take a bath, she heard a knock at the door. 
Appellant "pushed the door open" and, after he entered the house, the complainant
"tried to push" him to get him out of the house. The complainant heard her sister
warn her that appellant had a knife, and she saw appellant get a knife out of his
pocket, but could not recall which pocket. (2) After appellant pulled the knife out of his
pocket, she told appellant, "No, baby, give me the knife," and appellant cut her with
the knife. Appellant came down with the knife, and she received the cut on her hand
because she "was trying to take" the knife. (3) She described the cut as "just a little
slice." Eventually, Kimberly arrived at the scene. 

 During cross-examination, the complainant testified that after she opened the
door, appellant came in, tried to move her out of the way, and Kimberly came out of
the hallway. Kimberly and appellant "start[ed] hitting," and "they just had him on the
floor and they was around." She noted that she was never on the floor. She told the
others in the house not to all jump on appellant and he would calm down. The
complainant also asked for someone to call for emergency assistance. She explained
that when appellant was "on the floor and they was on him, he come out his pocket
with a knife" and told everyone he had a knife. Others in the group had a stick, but
she "wouldn't let them hit [appellant] because they was too many on him." When
appellant pulled out the "steak knife," she was "[n]ot really" afraid that he was going
to stab her or cause serious bodily injury. When the complainant grabbed appellant's
hand, the knife cut her, but she suffered no other wounds. In fact, she thought that
the officers arrested appellant because he was intoxicated. The complainant
explained that she did not think appellant was going to stab her, did not think
appellant was going to cause serious bodily injury, and she was not afraid of appellant
that morning. 

 Houston Police Department Officer M.B. Malone testified that, on March 5,
2005, he responded to a call for an "assault in progress." When he arrived at the
scene, approximately three minutes after being dispatched, a female at the door
"motioned" for Malone to come into the residence. The female "appeared as if she
wanted [Malone] to get there in a hurry." When he entered the house, he saw a "fairly
large pile of people in the hallway," with "a female laying [sic] on her back on the
floor" and appellant "on top of her, on his chest, laying [sic] on top of her." 
Appellant "was on his stomach" and "[h]is arms were outstretched." Malone was
later able to identify the female on the floor as the complainant. When asked whether
it appeared that anyone was assaulting appellant, Malone stated that it "appeared
more as if [appellant] was being restrained or held down." Appellant "had a knife in
his hands," which Malone described as a "regular kitchen steak knife." After
examining the knife on the witness stand, Malone testified that, in his opinion, there
was blood on the knife "based upon what [he] saw at the scene, the apparent injury
on the complainant's hand," and "[w]hat appeared to be blood on the knife at the
scene that particular night." He explained that by the time he arrived at the scene, the
complainant had "already wrapped her hand with some type of gauze or cloth or
something," and that her hand "appeared to have been bleeding."

 Officer Malone further testified that he talked to the complainant "briefly in the
house after bringing [appellant] out to the police car." He then spoke with the
complainant again outside of the home. The complainant appeared to be upset, and
she told him that "earlier in the night they were at a club." She said that appellant
"had been using crack cocaine that night and had got into an argument." She walked
home from the club, and a "[c]ouple hours later" appellant "appeared at the front
door." The complainant opened the door to speak with him, but appellant "forced his
way in the house." Both she and her sister asked appellant to leave, but he refused. 
He then "pulled a knife from one of his pockets and came at them with the knife." 
The complainant told Malone that she got the cut on her hand when "she had
attempted to defend herself by putting her hand up and [appellant] swung the knife
and sliced her hand." When Malone spoke with the complainant, "[s]he seemed as
if she had been crying," was "trembling," "kind of paused when she spoke," and
appeared afraid that appellant was going to hurt her. At that time, the complainant
indicated to Malone that she wanted appellant prosecuted. She also wanted a
protective order entered against appellant.

Standard of Review

 We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt. 
Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We note that
the trier of fact is the sole judge of the weight and credibility of the evidence. 
Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when
performing a legal sufficiency review, we may not re-evaluate the weight and
credibility of the evidence and substitute our judgment for that of the fact finder. 
Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any
inconsistencies in the evidence in favor of the verdict. Curry v. State, 30 S.W.3d 394,
406 (Tex. Crim. App. 2000).

 In a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is so
obviously weak as to undermine confidence in the jury's determination, i.e., that the
verdict seems "clearly wrong and manifestly unjust," or the proof of guilt, although
legally sufficient, is nevertheless against the great weight and preponderance of the
evidence. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). We
note that a jury is in the best position to evaluate the credibility of witnesses, and we
are required to afford "due deference" to the jury's determinations. Marshall v. State,
210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

"Threat" to Complainant


 In his first point of error, appellant argues that the evidence is legally and
factually insufficient to support his conviction for aggravated assault because the
evidence is insufficient to prove that appellant "threatened [the complainant] by the
use or exhibition of a deadly weapon."

 A person commits the offense of aggravated assault if the person intentionally
or knowingly threatens another with imminent bodily injury, and uses or exhibits a
deadly weapon during the commission of the assault. Tex. Pen. Code Ann. §§
22.01(a)(2), 22.02(a)(2) (Vernon Supp. 2006). 

 Appellant argues that the State failed to meet its burden to prove that he
intended to place the complainant "in apprehension of imminent bodily injury by the
use and exhibit[ion] of a knife" because "[a]ll through the record [the complainant]
testifies that she was not afraid, not threatened or in fear of the knife." He asserts that
the "presence of the knife did not instill fear or threaten" the complainant. Appellant
also argues that it would be "reasonable to conclude that the threat, if any, was
directed toward the [complainant's] sister, [Kimberly]," because the evidence shows
that Kimberly did not like appellant and disliked his presence inside her home.

 However, we note that it is not necessary that the complainant actually be
placed in fear of imminent serious bodily injury; it is the appellant's threat, made with
the intent to place the complainant in fear of imminent serious bodily injury, that
constitutes the offense. Trevino v. State, 752 S.W.2d 735, 736-37 (Tex.
App.--Eastland 1988, pet. dism'd). Here, Kimberly testified that the complainant
held up appellant's arm as he tried to stab the complainant. Kimberly told her
daughter to call for emergency assistance, and the complainant's son tried to help
Kimberly and the complainant. Kimberly tried to take the knife away from appellant
because she was afraid of people being cut and the complainant was holding the blade
of the knife. It was not until police officers arrived at the scene that the knife was
removed from appellant's possession. Kimberly also testified that, based on his use
of the knife and past events, appellant's actions made her feel threatened. Officer
Malone testified that when he arrived at the scene, the complainant appeared to be
upset, had been crying, and already had wrapped her hand "with some type of gauze
or cloth." Malone also stated that the complainant appeared afraid that appellant was
going to hurt her, and she indicated to him that she wanted appellant prosecuted.

 Viewing all the evidence in the light most favorable to the jury's verdict, we
conclude that a rational trier of fact could have found, beyond a reasonable doubt,
that appellant threatened the complainant by the use or exhibition of a deadly weapon. 
Furthermore, viewing the evidence neutrally, we conclude that the evidence is not so
weak that the verdict is clearly wrong or manifestly unjust or that the proof in support
of the verdict is against the great weight and preponderance of the evidence. 
Accordingly, we hold that the evidence is legally and factually sufficient to prove that
appellant threatened the complainant by the use or exhibition of a deadly weapon.

 We overrule appellant's first point of error.

Deadly Weapon

 In his second point of error, appellant argues that the evidence is legally and
factually insufficient to support his conviction for aggravated assault because the
State did not prove that "the knife allegedly used by [a]ppellant was a deadly
weapon."

 A deadly weapon is defined as "anything that in the manner of its use or
intended use is capable of causing death or serious bodily injury." Tex. Pen. Code
Ann. § 1.07(a)(17)(B) (Vernon Supp. 2006). Although a knife is not a deadly
weapon per se, a knife may be a deadly weapon based on the nature of its use or
intended use. Miller v. State, 177 S.W.3d 1, 4 (Tex. App.--Houston [1st Dist.] 2004,
no pet.); Garcia v. State, 17 S.W.3d 1, 4 (Tex. App.--Houston [1st Dist.] 1999, pet.
ref'd). To determine whether a particular knife is a deadly weapon, courts have
considered (1) the size, shape, and sharpness of the knife; (2) the manner of its use
or intended use; (3) the nature or existence of inflicted wounds; and (4) testimony
about the knife's life-threatening capabilities. Id. The State can, without expert
testimony, prove a particular knife to be a deadly weapon by showing its size, shape
and sharpness, the manner of its use, or intended use and its capacity to produce death
or serious bodily injury. Brown v. State, 716 S.W.2d 939, 946 (Tex. Crim. App.
1986). The physical proximity of the accused and the victim during the commission
of the offense may also be considered. See id. Whether a particular knife is a deadly
weapon depends upon the evidence presented at trial. See Thomas v. State, 821
S.W.2d 616, 620 (Tex. Crim. App. 1991).

 Appellant argues that the State failed to prove that the knife was a deadly
weapon because the knife was "a steak knife"; the "testimony describing [a]ppellant's
use of the knife is brief, vague, and very non descriptive"; although "the knife was
admitted into evidence, none of the State's witnesses testified about its sharpness";
the "nature or existence of the wound in this case does not qualify as serious bodily
injury" because the "wound was so minor that [the complainant] did not even infer
that she suffered pain"; there "was no testimony from either of the State's witnesses
as to the capabilities of the knife as being life threatening or its ability to inflict
serious bodily injury"; and there "was no testimony that [a]ppellant used threats or
words." 

 A "steak knife" is "a knife with a serrated blade." The New Oxford
American Dictionary 1666 (1st ed. 2001). It is true that the complainant did
testify that she was not afraid of appellant and did not think that appellant was going
to stab her or cause serious bodily injury. When appellant pulled the knife out of his
pocket, she told him, "[n]o, baby, give me the knife." The complainant described the
laceration that she received on her hand as "just a little slice." Although she testified
that she received the cut because she was trying to take the knife out of appellant's
hand, she also testified that she was acting in "self-defense." Moreover, Kimberly
testified that, as the complainant and appellant were arguing, the complainant "was
very scared" and appellant appeared to be "trying to stab" the complainant. 
Appellant's actions made Kimberly feel threatened, based not only on the knife, but
also on past events. Additionally, Officer Malone testified that the complainant
appeared to have been afraid that appellant was going to hurt her. The complainant
told him that she received the cut on her hand when "she had attempted to defend
herself by putting her hand up" and appellant "swung the knife and sliced her hand."

 Viewing all the evidence in the light most favorable to the jury's verdict, we
conclude that a rational trier of fact could have found, beyond a reasonable doubt,
that, based on the manner in which appellant used the steak knife, it was capable of
causing death or serious bodily injury and was a deadly weapon. Furthermore,
viewing the evidence neutrally, we conclude that the evidence is not so weak that the
verdict is clearly wrong or manifestly unjust or that the proof in support of the verdict
is against the great weight and preponderance of the evidence. Accordingly, we hold
that the evidence is legally and factually sufficient to prove that the steak knife used
by appellant was a deadly weapon.

 We overrule appellant's second point of error.

Conclusion


 We affirm the judgment of the trial court.



 Terry Jennings

 Justice


Panel consists of Justices Nuchia, Jennings, and Higley.


Do not publish. Tex. R. App. P. 47.2(b).
1. See Tex. Pen. Code Ann. §§ 22.01(a)(2), 22.02(a)(2) (Vernon Supp. 2006).
2. On re-direct examination, the complainant testified that appellant pulled out the knife
"[w]hen he came through the door."
3. On re-direct examination, the complainant testified that she got cut when she put her
hand up to defend herself.