RENDERED: JUNE 15, 2017
TO BE PUBLISHED

**Supreme Court of Kentucky**

2015-SC-000328-MR

DATE 7/6/17 Kim Redmon, DC

CHICO DUWAN RUCKER                                      APPELLANT

V.

ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE JAMES D. ISHMAEL, JR., JUDGE
NO. 14-CR-01178

COMMONWEALTH OF KENTUCKY                               APPELLEE

## OPINION OF THE COURT BY JUSTICE HUGHES

### REVERSING AND REMANDING

Appellant, Chico Duwan Rucker, appeals as a matter of right from a judgment of the Fayette Circuit Court sentencing him to twenty years' imprisonment for second-degree manslaughter, tampering with physical evidence, and fraudulent use of a credit card over $500. Rucker alleges the trial court erred in four ways: 1) by permitting the introduction of sexually explicit communications he made after the victim's death; 2) by authorizing the admission of sexually explicit communications he made before the victim's death; 3) by allowing the Commonwealth to introduce hearsay testimony; and 4) by permitting the Commonwealth to show photographs and a video recording depicting the victim's body. Due to the improper admission of Rucker's sexually explicit communications made after the victim's death, we reverse his conviction and remand this case to the trial court for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

During the evening of June 28, 2013, Elma Farris discovered another woman's phone number in Rucker's cellular phone. Farris, who was in a romantic relationship with Rucker, became upset and began to attack Rucker while he was asleep in bed. According to Rucker, he pushed Farris away from him, causing her to fall to the floor and hit her head. Afterwards, Rucker gathered some his belongings together and took a cab to spend the evening at an inn.

The following day, Rucker returned to Farris's apartment and discovered her body. Fearful of notifying the authorities, Rucker wrapped Farris's body in a shower curtain and disposed of it by placing it in a nearby dumpster. Afterwards, Rucker intermittently occupied Farris's apartment and used her debit card to make purchases and cash withdrawals.

A body was located a week later due to complaints of a foul odor. After Farris's relatives notified the authorities that she had been missing for several days, the body was identified as that of Farris. At the same time, police learned that Rucker and Farris had been romantically involved and living together.

On the same day that police discovered Farris's body, Rucker was arrested on unrelated traffic warrants. When searched Rucker was found with personal property belonging to Farris, including her cellular phone and debit card. Upon questioning by police, Rucker initially denied knowledge of Farris's disappearance, but he ultimately informed the police about their struggle and

2

his subsequent flight from the apartment. Rucker maintained that Farris's death was an accident and that he was unaware of her death until his return to the apartment the next day.

Rucker was indicted by the Fayette County grand jury for second-degree manslaughter, tampering with physical evidence, and fraudulent use of a credit card under $500.[1] After a jury trial, he was found guilty of all charges. The jury recommended ten years' imprisonment for second-degree manslaughter and five years' imprisonment for tampering with physical evidence and fraudulent use of a credit card over $500. The jury recommended that those sentences be served consecutively for a total sentence of twenty years' imprisonment, and the trial court sentenced Rucker accordingly. Rucker brings this appeal as a matter of right.

## ANALYSIS

### I. The Trial Court Abused Its Discretion by Permitting the Admission of Irrelevant and Unduly Prejudicial Prior-Bad-Acts Evidence.

Rucker argues that reversible error occurred when the trial court allowed the Commonwealth to introduce sexually explicit social media exchanges he had with other women after Farris's death.[2] We are compelled to agree.

---

[1] Later, the Commonwealth obtained a superseding indictment charging Rucker with second-degree manslaughter, tampering with physical evidence, and fraudulent use of a credit card over $500.

[2] Rucker also contends that the admission of this evidence violated his rights under the Fourteenth Amendment to the United States Constitution and Sections Two and Eleven of the Kentucky Constitution.

3

In Rucker's opening statement, he explained the process through which he discovered Farris's body. According to Rucker, when he arrived back at the apartment he discovered Farris's body and believed her to be asleep, but quickly realized that she was stiff, had no pulse, and was cold. Consequently, Rucker was "scared to death," and did not know what to do. When trial resumed the following morning, the Commonwealth sought to introduce in its case-in-chief sexually explicit communications involving Rucker. These sexually explicit images and conversations were exchanged through the use of Facebook—a social media platform. The conversations at issue covered a ten-day period beginning on June 28, 2013, the day of Farris's death, and lasting until July 7, 2013. The Commonwealth's theory of the case was that Rucker killed Farris on June 28 and that he returned to the apartment the following evening.

The Commonwealth argued that Rucker had opened the door to the admission of this evidence in his opening statement, and that it went to his state of mind. Rucker objected to the introduction of this evidence, claiming that the messages were irrelevant, unduly prejudicial, and improper character evidence under Kentucky Rule of Evidence (KRE) 404(b). The trial court permitted the introduction of this evidence, agreeing with the Commonwealth that the messages went to Rucker's state of mind and that they were not covered by KRE 404(b).

Subsequently, during the Commonwealth's case-in-chief, Detective Joe Sission, read portions of the Facebook messages sent by Rucker after Farris's

4

death to the jury. It took Detective Sission approximately nineteen minutes to read these exchanges. He also showed the jury two explicit photographs that Rucker sent with the messages.

Contrary to the trial court's ruling, Rucker's Facebook messages were prior-bad-acts evidence and therefore subject to analysis under KRE 404(b). The relevant portion of KRE 404(b) states as follows,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident;

While KRE 404(b)(1) offers some examples of other purposes, "it states the 'other purpose' provision in a way that leaves no doubt that the specifically listed purposes are illustrative rather than exhaustive." *Tamme v. Commonwealth*, 973 S.W.2d 13, 29 (Ky. 1998), *as modified on denial of rehearing* (Mar. 19, 1998) (quoting Lawson, THE KENTUCKY EVIDENCE LAW HANDBOOK § 2.25 at 161 (3rd ed. 1993)). Courts must weigh the admission of KRE 404(b) evidence carefully so as to avoid the admission of character evidence that "is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 476, 69 S. Ct. 213, 218 (1948). *See also United States v. Vance*, 871 F.2d 572 (6th Cir. 1989) ("By limiting the admission of bad acts evidence, [Federal Rule of Evidence (FRE)] Rule 404(b) therefore helps secure the

5

presumption of innocence and its corollary 'that a defendant must be tried for what he did, not for who he is.'" (quoting *United States v. Myers*, 550 F.2d 1036, 1044 (5th Cir. 1977), *cert denied*, 439 U.S. 847, 99 S. Ct. 147 (1978))).

In the case at bar, the trial court concluded that Rucker's Facebook messages did not fall under KRE 404(b), as this conduct was not a crime or a wrong. However, this evidence is covered by KRE 404(b) as Rucker's conduct unquestionably constituted an "act."[3] "KRE 404(b) is not limited to other acts that are criminal or unlawful, but applies to any acts offered to prove character in order to show action in conformity therewith." *Davis v. Commonwealth*, 147 S.W.3d 709, 723 (Ky. 2004) (citing Lawson, THE KENTUCKY EVIDENCE LAW HANDBOOK, § 2.25[2] at 125 (4th ed. 2003)). Moreover, KRE 404(b) also applies to acts that are committed after the charged offense. *See, e.g., United States v. Lighty*, 616 F.3d 321, 352, n.33 (4th Cir. 2010) ("no distinction between 'prior' bad acts and 'subsequent' bad acts for purposes of Rule 404(b)").

On appeal, the Commonwealth contends that 404(b) does not apply to the admission of Rucker's communications as KRE 404(b) "proscribes the introduction of evidence tending to prove a particular character trait 'in order to show action in conformity therewith.' Evidence of immorality would not tend to prove a propensity or predisposition to commit homicide." This interpretation of what constitutes KRE 404(b) evidence is too narrow and would

---

[3] *BLACK'S LAW DICTIONARY* (10th ed. 2014) contains multiple definitions for "act," but the one most pertinent to this discussion is "[s]omething done or performed, esp. voluntarily; a deed."

6

permit the Commonwealth to obtain a conviction based on the low character of the defendant. *See United States v. Dunn*, 805 F.2d 1275, 1280 (6th Cir. 1986) (Evidence of crimes allegedly committed by the defendant, must "be subjected to [FRE] Rule 404(b) inquiry in order to ensure that it is not used to show that, on the occasion in question, the accused 'acted in conformity therewith,' or to show the defendant's bad character or criminal propensity."); *See also Meece v. Commonwealth*, 348 S.W.3d 627, 664 (Ky. 2011) (Admission of testimony in Commonwealth's case-in-chief in homicide case which established defendant's talent for lying was error as it was "a preemptive attack on [defendant's] credibility," and "it reflect[ed] upon a trait of character within the confines of KRE 404(b)).

It is clear that the Commonwealth's purpose in showing the jury these Facebook conversations, which included sexually explicit photos of Rucker, was simply to demonstrate that he is a contemptible person of low character. Further, by showing that Rucker engaged in explicit sexual conversations with multiple women, immediately after the death of his girlfriend, the Commonwealth preemptively sought to undermine any suggestion that Rucker genuinely cared about Farris. These "bad acts" were plainly subject to analysis under KRS 404(b).

"To determine whether evidence of prior bad acts is admissible, we must decide if the evidence is relevant 'for some purpose other than to prove the criminal disposition of the accused[,] probative as to the actual commission of the prior bad act, and not overly prejudicial under KRE 403." *Kerr v.*

7

*Commonwealth*, 400 S.W.3d 250, 260 (Ky. 2013) (quoting *Meece*, 348 S.W.3d at 662); (citing *King v. Commonwealth*, 276 S.W.3d 270, 275 (Ky. 2009)). We review the KRE 403 "evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Major v. Commonwealth*, 177 S.W.3d 700, 707 (Ky. 2005) (citing *Turpin v. Kassulke*, 26 F.3d 1392, 1400 (6th Cir. 1994)).

The standard of review for a trial court's evidentiary ruling is abuse of discretion. *Meskimen v. Commonwealth*, 435 S.W.3d 526, 534 (Ky. 2013) (citing *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007)). The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

In the case at bar, the Commonwealth argued that the messages and images Rucker sent after Farris's death were appropriately admitted as they went to Rucker's state of mind. This argument is meritless as Rucker's sexually explicit communications to various women were not probative of his state of mind regarding crimes that had already been committed against his former girlfriend. *Cf. Sherroan v. Commonwealth*, 142 S.W.3d 7, 18-19 (Ky. 2004) (Threat to kill third party, made hours before defendant committed multiple murders, was admissible under KRE 404(b) as it went to defendant's state of mind.). Nor did any of Rucker's messages pertain in any way to the

crimes with which he was charged. Accordingly, the messages and images sent by Rucker after Farris's death had no relevancy.[4]

However, even if we were to agree with the Commonwealth that this evidence went to Rucker's state of mind, it should not have been admitted under KRE 403. The probative value of this evidence, was grossly outweighed by the prejudicial effect of the evidence, which painted Rucker in a bad light by establishing that he was a callous philanderer. Accordingly, the trial court abused its discretion in permitting the admission of this evidence.

Additionally, later in the trial the Commonwealth was permitted to play two sexually graphic audio recordings involving Rucker. This occurred during the Commonwealth's cross-examination of Rucker when he was asked about charges that he made to Farris's credit card after her death. Rucker responded that he had used the credit card to pay fees to certain adult sites. The Commonwealth argued that this was a false claim and that he was instead

---

[4] The Commonwealth also argues that Rucker opened the door to this evidence by putting his mental state at issue during opening statement. "Generally stated, 'opening the door' to otherwise inadmissible evidence is a form of waiver that happens when one party's use of inadmissible evidence justifies the opposing party's rebuttal of that evidence with equally inadmissible proof." *Commonwealth v. Stone*, 291 S.W.3d 696, 701-02 (Ky. 2009) (citing *Purcell v. Commonwealth*, 149 S.W.3d 382, 399 (Ky. 2004)). While evidence of conversations occurring prior to Farris's death, would be relevant to Rucker's state of mind at the time he committed the offense, messages written after Rucker killed Farris and disposed of her body are generally irrelevant to his state of mind. We also note that post-murder messages could in some circumstances be relevant, but given the content of the messages Rucker sent that is plainly not the case here. As such, the Commonwealth was not entitled under the guise of responding to Rucker's opening the door to his mental state, to introduce irrelevant and prejudicial evidence created long after the commission of the offense. While Rucker opened the door to his mental state he did "not open the door to the storm of evidence that followed." *Purcell*, 149 S.W.3d at 399 (quoting *Sanborn v. Commonwealth*, 754 S.W.2d 534, 548 (Ky. 1988)).

using the card to engage in phone sex. The trial court accepted this argument and permitted the Commonwealth to play the recordings to impeach Rucker's testimony. However, it is not clear that Rucker made a false claim. As he explained in his testimony, Rucker used the card to purchase access to a website which would allow him to create a profile outlining his sexual desires. Subsequently, women would respond to his profile and then Rucker would call those interested women and leave sexually explicit messages. Rucker testified that he purchased sixty minutes' worth of time to make these calls. Based on this testimony, it is not clear that Rucker lied, warranting impeachment on this issue. However, even assuming that Rucker misstated how he used Farris's credit card, the trial court went too far in permitting the Commonwealth to rebut that claim. It would be one thing for the Commonwealth to impeach Rucker or introduce records showing that he used this sexual service. This could logically be done for the purpose of showing Rucker's improper use of Farris's credit card. However, playing recordings where Rucker details sexual acts, served no legitimate purpose, and was just a further effort on the part of the Commonwealth to paint Rucker as a sexual deviant. Accordingly, the trial court abused its discretion by permitting the admission of these recordings.

"A non-constitutional evidentiary error may be deemed harmless, the United States Supreme Court has explained, if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky. 2009) (citing *Kotteakos v. United States*, 328 U.S. 750, 66 S. Ct. 1239 (1946)). The key

10

inquiry is "whether the error itself had substantial influence [on the result]. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* (quoting *Kotteakos*, 328 U.S. at 765). Here, the Facebook messages, images, and sexually graphic audio recordings were unnecessary to establish the Commonwealth's case, but this evidence carried with it an overwhelming potential for prejudice. That Rucker received the maximum twenty-year sentence from the jury suggests at a minimum that this error contributed to the final result. As such, we cannot conclude that the erroneous admission of this evidence was harmless error.

We are compelled to observe that this outcome is lamentable given the overall strength of the evidence against Rucker. The admission of this post-death evidence was absolutely unnecessary to secure what should have been a relatively obvious conviction. However, the Commonwealth's overzealousness in pursuing the admission of this evidence, and the trial court's error in admitting same, resulted in a fundamentally flawed proceeding, which necessitates reversal. Having reversed, we will examine Rucker's additional claims of error that are likely to recur upon retrial. *Major*, 177 S.W.3d at 704 (citing *Springer v. Commonwealth*, 998 S.W.2d 439, 445 (Ky. 1999)).

## II. The Trial Court Did Not Abuse its Discretion in Admitting Sexually Explicit Exchanges Between Rucker and Other Women that Occurred Before Farris's Death.

Rucker also contends that admission of Facebook messages he wrote to other women prior to Farris's death was improper. We disagree.

11

When a defendant elects to testify at trial, "he subjects himself to that character of examination that can be made of any other witness; and his inclination to tell the truth, or to swear falsely, may be shown by the commonwealth in the usual mode of impeaching the general character of a witness for truth and veracity." *Scott v. Commonwealth*, 685 S.W.2d 184, 186 (Ky. 1984) (quoting *McDonald v. Commonwealth*, 4 S.W. 687, 688 (Ky. 1887)). As such, by claiming that Farris had no reason to be upset with him as he was not being unfaithful to her, Rucker opened the door to the Commonwealth exploring the veracity of his claims and impeaching his credibility. In short, on those facts there was no error in the admission of Rucker's statements made prior to Farris's death.

## III. The Trial Court Did Not Abuse Its Discretion in Admitting Hearsay Testimony.

Rucker argues that the trial court erred by permitting the Commonwealth to introduce inadmissible hearsay testimony from Farris's cousin, Shalia Ferguson. In response to the Commonwealth's questioning regarding Farris's relationship with Rucker, Ferguson responded, "She was getting tired of taking care of him . . . she said that she gave him an ultimatum to leave. He was to either find a job by July 1st or leave . . . . She was giving him a month to find a job." The trial court determined that Ferguson's hearsay testimony was admissible pursuant to the state-of-mind exception found in KRE 803(3). We review the trial court's admission of this evidence under an abuse of discretion standard. *Meskimen*, 435 S.W.3d at 534.

12

Whether an out-of-court statement qualifies as an exception to the bar against hearsay depends on the circumstances of each case, and the trial court's ruling will not be disturbed unless clearly erroneous. *Noel v. Commonwealth*, 76 S.W.3d 923, 926 (Ky. 2002) (citations omitted). KRE 803(3) allows hearsay testimony if it demonstrates "the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." Rucker argues that Ferguson's testimony concerned past facts, and did not indicate Farris' present state of mind. He contends the requirements of KRE 803(3) were not met since Ferguson's testimony concerned an ultimatum that Farris had already relayed to Rucker. We disagree.

The "crucial component of [KRE 803(3)] [i]s contemporaneity of the declarant's state of mind and the statement describing it," and it "le[aves] no room for the use of a statement describing a state of mind that existed at some earlier point in time." Robert G. Lawson, THE KENTUCKY EVIDENCE LAW HANDBOOK § 8.5[2][a] at 647-48 (5th ed. 2013). Accordingly, the statement cannot solely concern past information, but may instead "cast light upon [] future intentions . . . ." *Ernst v. Commonwealth*, 160 S.W.3d 744, 753 (Ky. 2005) (citing *Crowe v. Commonwealth*, 38 S.W.3d 379, 383 (Ky. 2001)). This Court explained the distinction between past versus present mental states in *Dillon v. Commonwealth*, 475 S.W.3d 1 (Ky. 2015). The Court clarified that "the statement 'I felt scared yesterday' would not be admissible, but the statement 'I feel scared now' would be, if relevant to a given case." *Id.* at 23.

13

While it is true that Farris's statement concerned a past conversation she had with Rucker, it also demonstrated her then-present intentions concerning a future event—she would leave Rucker by July 1 if he failed to obtain employment. *See Ernst,* 160 S.W.3d at 753 (KRE 803(3) permitted the introduction of testimony that victim intended to evict appellant). Additionally, this Court has consistently determined that a victim's statement concerning future plans to break off a relationship with the offender is admissible as state of mind evidence. *See, e.g., Dillon,* 475 S.W.3d at 23 (victim's statements to daughter that she planned on leaving the appellant and moving to a different state were admissible under KRE 803(3)); *Crowe,* 38 S.W.3d at 383 (victim's statements to coworkers that she planned on filing for divorce from appellant demonstrated her mental state). Allowing this type of evidence shows estrangement and bad feelings between Farris and Rucker. Whether Farris did in fact provide the ultimatum to Rucker is irrelevant. Farris's statement that she planned on evicting Rucker gave the jury a testimonial picture of her state of mind towards Rucker.

Even though Ferguson's testimony falls within the scope of the state of mind hearsay exception, it must also have relevancy to be admissible. *Blair v. Commonwealth,* 144 S.W.3d 801, 805 (Ky. 2004) (citing *Bray v. Commonwealth,* 68 S.W.3d 375, 381-82 (Ky. 2002)). Ferguson's testimony was relevant considering, on the night in question, Rucker was less than three days away from the deadline of Farris's ultimatum, and had yet to obtain employment. The case at bar is similar to *Ernst,* in which a tenant murdered his landlord.

14

160 S.W.3d at 749. The victim's daughter testified that her mother stated she was going to evict Ernst. *Id.* at 753. The Court allowed the daughter's hearsay statements pursuant to KRE 803(3) and found that the statements were relevant "to prove the increasingly strained relations between [the victim and Ernst] tending to show a motive for [] murder thus refuting [Ernst's] claims that [her] death was either of internal origin (sudden collapse) or accidental (unintentional strangulation)." *Id.* at 754. This is exactly what we have here. The state of mind of the victim is relevant to demonstrate the growing animosity between her and Rucker. Farris's statement to Ferguson was not admitted for the truth of the statement—that she did in fact give Rucker an ultimatum—but rather to establish Farris's state of mind. There was no error in the admission of Ferguson's testimony.

## IV. The Trial Court Did Not Abuse Its Discretion in Admitting Photographs and a Video Recording of Farris's Body.

Rucker's final argument is that the trial court erred in permitting the jury to view photographs and a video recording of Farris's body.[5] During the trial, the jury viewed eleven pictures of Farris's body as it was found at the crime scene and during the autopsy. The Commonwealth also played a video recording of the crime scene which displayed the condition of Farris's remains. Rucker maintains that the photographs and video recording were too gruesome for the jury to view, thereby evoking prejudice. He takes particular issue with

---

[5] Rucker contends that the admission of this evidence violated his rights under the Fourteenth Amendment to the United States Constitution and Sections One, Two, and Eleven of the Kentucky Constitution.

15

the video recording's depiction of flies on Farris's body. The trial court's admission of this evidence is reviewed under an abuse of discretion standard. *Meskimen,* 435 S.W.3d at 534.

In order to evaluate the admissibility of the photographs and video recording, the Court must determine if the probative value of the evidence was substantially outweighed by its prejudicial effect. *Adkins v. Commonwealth,* 96 S.W.3d 779, 794 (Ky. 2003) (citing KRE 403) ("[P]hotographs that are probative of the nature of the injuries inflicted are not excluded unless they are so inflammatory that their probative value is substantially outweighed by their prejudicial effect."); *see also Fields v. Commonwealth,* 12 S.W.3d 275, 279 (Ky. 2000) (citing *Bedell v. Commonwealth,* 870 S.W.2d 779 (Ky. 1993); *Milburn v. Commonwealth,* 788 S.W.2d 253 (Ky. 1989) ("A videotape of a crime scene, including the position of the victim's body and the location of the victim's injuries, is just as admissible as a photograph, assuming a proper foundation is laid.").

In the case at bar, both the photographs and video recording had substantial probative value. In addition to depicting the location of the crime, and Rucker's attempt to conceal Farris's body, the evidence also assisted the jury in determining that Rucker caused injury to Farris that resulted in her death. This conclusion was particularly difficult for the jury to deduce based on Rucker's denial of causing Farris a serious injury and the medical examiner's inability to pinpoint a cause of death.

16

By the time that the police were able to recover Farris's body, it had already become severely decomposed. The degree of decomposition was such that the medical examiner was unable to identify a time of death, the victim's age, or race. While the medical examiner was not able to definitively state a cause of death, she also was unable to identify a natural disease or disorder that would have caused Farris's death. Based on her examination, the medical examiner opined that blunt force trauma was not the cause of Farris's death. Additionally, the medical examiner was unable to say whether strangulation or suffocation was the cause of Farris's death, again due to the level of decomposition. As such this photographic/video evidence had extensive probative value as it shed light on a material fact. The Commonwealth was entitled to provide the jury with evidence explaining the absence of a definitive cause of death for Farris. Also, there was no other evidentiary alternative to demonstrate the extent of the medical examiner's difficulty.[6]

The Court acknowledges that both the photographs and video recording likely perpetuated some prejudice. Farris' body was bloated, discolored, and

---

[6] In arguing that this evidence was improperly admitted Rucker relies on *Hall v. Commonwealth*, 468 S.W. 814 (Ky. 2015). This Court reversed Hall's conviction due to the admission of twenty-eight crime scene photographs which were unduly prejudicial and needlessly cumulative. *Id.* at 827. The Court noted that the probative value of many of the gruesome crime scene photos was quite low as "there was more than enough alternative evidence—including the less gruesome photos, extensive lay and expert witness testimony, and the crime scene video—to easily prove the same facts beyond a reasonable doubt." *Id.* at 825. However, *Hall* is distinguishable from the case at bar. The photographs and video recording in this case were more probative than prejudicial as they were necessary to explain why it was impossible to determine Farris's likely cause of death. Nor was the admission of this evidence needlessly cumulative.

insects were present. However, we have explained that as a general rule "a photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous." *Funk v. Commonwealth*, 842 S.W.2d 476, 479 (Ky. 1992) (citing *Gall v. Commonwealth*, 607 S.W.2d 97 (Ky. 1980)).

Here, the photographs and video recording do not display a body that has "been materially altered by mutilation, autopsy, decomposition or other extraneous causes, not related to the commission of the crime . . . ." *Clark v. Commonwealth*, 833 S.W. 2d 793, 794 (Ky. 1991). Nor, were the depictions of the victim's body admitted solely to produce shock and revulsion, as was the case in *Funk*. 842 S.W.2d at 478. Rather, the evidence had extensive probative value. Additionally, while disturbing, the photographs and video recording of Farris's body were not remarkably worse than any other highly probative images this Court has permitted into evidence. *See, e.g. Ross v. Commonwealth*, 455 S.W.3d 899, 910 (Ky. 2015) (permitting the introduction of pictures showing the victim's body which was "charred nearly beyond recognition as a human corpse with the intestines protruding from his abdomen . . . ."). Accordingly, the trial court did not abuse its discretion in determining that the photographs' and video recording's probative value substantially outweighed their prejudicial effect.

## CONCLUSION

The judgment and sentence are hereby reversed, and the matter is remanded to the Fayette Circuit Court for a new trial.

18

Minton, C.J.; Venters and Wright, J.J., concur. Cunningham, J., dissents by separate opinion in which Keller and VanMeter, JJ., join.

CUNNINGHAM, J., DISSENTING: I respectfully dissent from the Majority's opinion due to its application of KRE 404(b) and its finding of reversible error.

The Majority's opinion today demonstrates an incorrect and inconsistent use of the KRE 404(b) exclusion. The crux of any 404(b) analysis centers on the proffered evidence's objective. *See, e.g, Davis v. Commonwealth,* 147 S.W.3d 709, 723 (Ky. 2004). In other words, what purpose is the evidence being used for? In regards to the Facebook messages which occurred subsequent to Ms. Farris' death, the Commonwealth made clear that it was offering the evidence to challenge Rucker's credibility. Such an objective, as will be discussed, may be questionable. Even so, the Commonwealth provided a reasonable argument that it was attempting to rebut the defense's opening statements portraying Rucker as a terrified and unknowing discoverer of Farris' body. Accordingly, I find it perplexing that the Majority utilizes KRE 404(b), as opposed to the other applicable Rules of Evidence, to find error.

As the Majority has already detailed, KRE 404(b) prohibits the introduction of "[e]vidence of other crimes, wrongs, or acts" used "to prove the character of a person in order to show action in conformity therewith." The Majority's analysis fails to find the existence of the rule's second requirement for exclusion—that Rucker's Facebook messages were offered to show action in conformity therewith. Instead, the Majority merely concludes that the

19

introduction of Rucker's Facebook messages violated KRE 404(b) because it showed that "he is a contemptible person of low character." For many reasons, this is not the standard by which we invoke the 404(b) exclusion. Indeed, if the Court excluded all prior bad acts simply because they revealed the defendant's shameful character, we would have no need for the evidentiary rule. Such an analysis is more appropriate for the inevitable KRE 403 balancing test.

For these reasons, the Court should utilize the correct analysis, which investigates whether the Commonwealth's introduction of Rucker's messages was an attempt to demonstrate that he was any more or any less likely to kill Ms. Farris. In this regard, the Majority's reasoning that Rucker's appetite for sexual communications somehow demonstrates a criminal propensity for manslaughter is unsound. The Commonwealth's motive in introducing the evidence was merely an attempt, however unnecessary, to impeach Rucker's credibility and defense. Thusly, I do not believe Rucker's Facebook messages fell within the purview of 404(b).

Nevertheless, I do agree that it was error for the trial court to admit Rucker's Facebook messages pursuant to KRE 401, 402, and 403. First, Rucker's Facebook messages had little, if any, relevancy to the case at bar. Whether Rucker was scared upon discovering Ms. Farris' body is not a fact of consequence to the determination of the crimes charged. KRE 401. Moreover, the need to refute such a claim proves doubtful, as the statement that Rucker was "scared to death" was brief and occurred during opening statements. In addition, the evidence certainly induced prejudice as it demonstrated that

20

Rucker was more preoccupied with satisfying his sexual desires than mourning the loss of his girlfriend.

Despite the error, I disagree with the Majority that the admission of Rucker's Facebook messages rises to the level of reversible error. As explained below, the jury was informed of Rucker's relentless infidelity preceding Ms. Farris' death. The jury was also properly presented with evidence that he used Ms. Farris' debit card to purchase a phone sex service. The prejudice Rucker endured from the introduction of his Facebook messages was likely negligible considering the amount of other evidence demonstrating his preoccupation with sexual communications. In light of the overwhelming evidence of Rucker's guilt, including his admission to injuring Ms. Farris, the erroneously admitted messages likely had no effect on the jury's ultimate determination. *See* RCr 9.24.

I also differ with the Majority's conclusion that Rucker's recorded sexually explicit phone messages were both irrelevant and unduly prejudicial. Rucker testified that Ms. Farris had provided him with a copy of her debit card and stated that she allowed him to use it prior to her death. Rucker was essentially claiming that Ms. Farris had consented to his use of her debit card. During cross-examination, the Commonwealth questioned Rucker about a specific charge on Ms. Farris' debit card which was incurred from the use of a 1-800 number. Rucker acted clueless, claiming that he used her debit card for "some things I paid off, certain fees to social sites, personal sites, adult sites. I was paying off the fees for some of those. I believe that is probably included in

21

one of those." In response, the Commonwealth introduced the recordings to show that the charges actually arose from a paid subscription to a service whereby Rucker sent and received sexual voice messages with other women.

This Court has explained that "[a] 'fact that is of consequence to the determination of the action' includes not only a fact tending to prove an element of the offense, but also a fact tending to disprove a defense." *Dunlap v. Commonwealth,* 435 S.W.3d 537, 592 (Ky. 2013). In this respect, the evidence was probative in that it demonstrated to the jury that Rucker was not innocently paying off internet fees that the couple may have previously incurred together, or that Ms. Farris would have consented to, but that he was really using the deceased's money to engage in phone sex. I believe the trial court properly exercised its wide-ranging discretion in determining that the recordings could be used to impeach Rucker. Even assuming that the recordings were admitted in error, they certainly do not necessitate a new jury trial. Any likely harm was minimal considering the overwhelming proof of Rucker's guilt, the jury's knowledge of his use of the "adult site," and the fact that the jury, just ten minutes prior, viewed highly sexual Facebook messages Rucker sent to numerous women just before Ms. Farris' death.

For the aforementioned reasons, I would affirm the Fayette Circuit's judgment and sentence.

Keller and VanMeter, JJ., join.

22

COUNSEL FOR APPELLANT:

John Gerhart Landon
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear, Attorney General of Kentucky

Joseph Todd Henning
Assistant Attorney General
Office of the Attorney General